LANDON et al. v. PUBLIC UTILITIES COMMISSION OF KANSAS et al.

(District Court, D. Kansas, First Division. May 26 and June 3, 1916.)

No. 136-N.

1. COURTS ⬦497—JURISDICTION OF NATIONAL COURTS—CONFLICT—RECEIVERSHIP—CONFISCATORY RATES.

A national court, which has jurisdiction of a suit in it to foreclose a mortgage upon the property of a public service corporation which is operating in three states under a receiver of its property in one of the states appointed by a state court, and under the same person appointed a receiver of its property in the two other states by the national court, and directed by that court to operate the business and property of the corporation in the three states as a unit, under the direction of the state court until further orders of the national court, has jurisdiction, on the petition of the receiver, to prevent the public utilities commissions of the states from destroying or irreparably injuring the business or property of the receiver and the corporation by making or enforcing unreasonably low and confiscatory rates for the sale of their product (in this case natural gas) to the purchasers from them in those states.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1386, 1397, 1398, 1404–1406; Dec. Dig. ⬦497.]

2. GAS ⬦14(1)—NATURAL GAS COMPANY—RATES FIXED BY STATE—CONSTITUTIONALITY.

Rates for gas fixed by a state commission to be charged by a natural gas company, which purchased, piped, and distributed gas to a large number of cities and towns, *held* confiscatory and unconstitutional, on the ground that the commission failed to take into consideration in fixing the rates the diminishing supply of gas and the consequent constantly increasing price, and the necessity for the company to extend its pipe lines into new fields, or the probable short life of the company, due to the same facts; also *held* that, taking into account the nature of its business, the company was entitled to earn 8 per cent. on its capital invested, instead of 6 per cent., which was the basis of the rates fixed by the commission.

[Ed. Note.—For other cases, see Gas, Cent. Dig. § 10; Dec. Dig. ⬦14(1).]

3. GAS ⬦14(1)—NATURAL GAS COMPANY—OPERATION BY RECEIVER.

Where the creditors of the gas company, which was being operated by a receiver, consented to its expenditure of certain sums from its annual earnings for extensions and betterments, on condition that the property be operated at compensatory rates, the customers of the company are entitled to have such expenditures made to the extent necessary to supply them with gas at reasonable rates, before payments are made on the principal of the company's debts.

[Ed. Note.—For other cases, see Gas, Cent. Dig. § 10; Dec. Dig. ⬦14(1).]

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. COURTS ⬲371(1)—FEDERAL COURTS—ENFORCING REMEDIES GIVEN BY STATE STATUTES.

Rights created by the statutes of the states, to be pursued in the state courts, may be enforced and administered in the national courts, either at law, in equity, or in admiralty, as the nature of the rights or remedies may require.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 972; Dec. Dig. ⬲371(1).]

5. COMMERCE ⬲57—"INTERSTATE COMMERCE"—TRANSPORTATION AND SALE OF NATURAL GAS.

Natural gas, procured by a company or its receiver in one state and piped into and sold in another state, is an article of interstate commerce, and does not lose that character because it is mixed in the pipes with a small quantity of gas procured in the state in which it is sold. The company, or its receiver, conducting such business, is engaged in "interstate commerce," and the enforcement by the state in which the sales are made of any law or regulation which substantially burdens the business, or renders it impossible to conduct it at a fair profit, is an undue interference with interstate commerce, in violation of the commerce clause of the federal Constitution.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 72–76, 88, 90, 92–102; Dec. Dig. ⬲57.

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

6. JUDGMENT ⬲740—MATTERS CONCLUDED—NONESSENTIAL HOLDINGS.

Reasons given by courts in their opinions for conclusions they reach, which are not necessary to, and are not embodied in or made parts of, the adjudications which follow, do not work the estoppel of res judicata.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1268; Dec. Dig. ⬲740.]

7. EQUITY ⬲195—CROSS-BILL—NATURE AND OFFICE.

A cross-bill may not interpose new controversies between codefendants to the original bill, the decision of which is unnecessary to a complete determination of the controversies between the complainant and the defendants over the subject-matter of the original bill.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 446–449; Dec. Dig. ⬲195.]

In Equity. Suit by John M. Landon, as receiver of the Kansas Natural Gas Company, and others, against the Public Utilities Commission of the State of Kansas and others. On motion for interlocutory injunction. Granted as to certain of the defendants.

John H. Atwood, of Kansas City, Mo., Robert Stone, of Topeka, Kan., Chester I. Long, of Wichita, Kan., and T. S. Salathiel, of Independence, Kan., for complainant receiver.

H. O. Caster and Fred S. Jackson, both of Topeka, Kan., for defendant Public Utilities Commission of Kansas.

William G. Busby, of Carrollton, Mo.,' and Alex Z. Patterson, of Jefferson City, Mo. (James D. Lindsay, of Jefferson City, Mo., on the brief), for defendants Public Service Commission and Attorney General of Missouri.

J. A. Harzfield and A. F. Evans, both of Kansas City, Mo., for defendant Kansas City, Mo.

William E. Stringfellow, of St. Joseph, Mo. (Olin, Butler, Stebbins

& Stroud, of Madison, Wis., and Culver & Phillip, of St. Joseph, Mo., on the brief), for intervener St. Joseph Gas Co.

J. W. Dana and C. E. Small, both of Kansas City, Mo., for Kansas City Gas Co. and Wyandotte County Gas Co.

T. F. Doran, of Topeka, Kan., for Consumers' Light, Heat & Power Co.

Charles A. Loomis, of Kansas City, Mo., for Ottawa Gas & Electric Co. and other distributing companies.

Charles L. Faust, of St. Joseph, Mo., for city of St. Joseph, Mo.

Charles Blood Smith, of Topeka, Kan., for Fidelity Title & Trust Co.

A. M. Baird, of Carterville, Mo., for city of Oronogo, Mo.

E. F. Cameron, of Joplin, Mo., for city of Joplin, Mo.

Before SANBORN, Circuit Judge, and CAMPBELL and BOOTH, District Judges.

## On Challenge of the Jurisdiction of the Court.

SANBORN, Circuit Judge. The receiver of this court and of the district court of Montgomery county, Kan., brings a dependent bill in this court in the original suits brought by a creditor and the trustee for mortgage bondholders to take possession of the property of the Kansas Natural Gas Company and that of some other defendants, to appoint receivers of that property, administer the property, foreclose the mortgage, dispose of the property, and distribute its proceeds, first to the lienholders; second, to the unsecured creditors; third, to the stockholders. This receiver claims that, while he is operating the property for the benefit of the beneficiaries, the commissions of Missouri and Kansas are fixing rates which are and threaten to be unreasonable, noncompensatory, confiscatory, and to interfere with the interstate commerce in natural gas which he is conducting. The bill is challenged, and his right to an injunction from this court to prevent these alleged wrongful acts is objected to, on the ground that this court has no jurisdiction to issue an injunction to prevent these alleged wrongful doings.

[1] On February 14, 1913, this court had jurisdiction and complete control of all this property in the original suit to which reference has been made. The power is conferred and the duty is imposed upon every court in equity, which takes into its possession for administration and disposition the property of owners and lienholders, to exercise any power it has to protect that property from depreciation by the wrongful act of any person or party. Hence it was that, when this court originally took jurisdiction of this property in the original suits, it issued its injunction against all persons, requiring that they interfere not with any of this property. Hence it is that under the law, when a court of equity has taken possession of property for such purposes, a circle of segregation is drawn around it and the ordinary processes of the law cease to reach it. Neither attachment nor execution may seize one iota of the property, but all controversies concerning it, all claims to it, must be adjudicated upon application to the court which holds the dominion of the property for the beneficiaries. Such was the condition of this cause in this court on February 14, 1913. This court

subsequently learned that the officials of the state of Kansas had brought a suit in the district court of Montgomery county, Kan., for the purpose of seizing the property of the Kansas Natural Gas Company, winding up that corporation, selling or disposing of or operating its property as the court should see fit, because it was alleged to have violated the anti-trust law of Kansas. When that fact was discovered, because the court in Kansas had the primary right to discharge its duty regarding this property, first, because the suit in that court was brought before the suit in this court, this court turned over to the receiver appointed by the Kansas court the possession, management, and control of that property until such time as it should renounce possession, and until it should have discharged its duty to the state of Kansas and to the owners of this property under the anti-trust law.

The fact then developed that the property in Kansas, the property in Missouri, and the property in Oklahoma constituted a unit, and that it should not be divided into its three parts and separately operated, without that very spoliation and destruction that is alleged may come from noncompensatory rates, without a depreciation of the value of the property and an impracticability of wise and beneficial operation. At this time the properties in Oklahoma and Missouri were still within the jurisdiction and complete control of this court, and the court in Kansas had not then and never has had any inherent power, nor could the state of Kansas give it any power, to take, manage, or control the property in Oklahoma or Missouri. It was in the power of this court at that time to order its receiver, Mr. Sharritt, to operate the property in Missouri and Oklahoma in harmony with the receiver in Kansas. It was in its power to appoint a master, and to direct that he should see that the receiver of this court should operate in that way. It was in its power to appoint the same man receiver that had been appointed by the Kansas court, and to direct him to operate in harmony with himself; and upon consideration of the facts and circumstances the court came to the conclusion that the wise method of operation was to appoint the same man whom the Kansas court had appointed receiver of the Kansas property its receiver of the Missouri and Oklahoma property, ancillary to the receivership in this court. The Kansas property was delivered over, because the Kansas receiver, the receiver appointed by the Kansas court, had the primary right to take it, to enable that court to discharge its duty, leaving the reversion of the property and the control of it, subject to that temporary operation of the Kansas court, still within the jurisdiction of this court. This court, therefore, appointed the same man who was the receiver of the Kansas court the receiver of this court of the Oklahoma and Missouri property. I say the Kansas receiver, because, although two receivers, I know, were appointed, one of them has deceased. It is more convenient to treat this matter as though there was only one receiver in Kansas then, as there is only one now.

Now, whenever it appears to the receiver of this court, or of any court, which has control or management of property of this character, that there is danger of its destruction or depreciation by the wrongful act of any one, it is the duty of that receiver to apply to the court, whose hand he is, to protect that property from such destruction or

interference. And pursuant to that duty this receiver, whose only power over the Oklahoma and Missouri property is derived, from this court, has applied to this court by this dependent bill to exercise its power to prevent the depreciation of the property in his possession.

It is the opinion of the court that under these circumstances, however desirous the court might be to renounce or avoid the exercise of power or jurisdiction, it cannot lawfully do so, and that, if the allegations of this bill are true (a question that of course must be hereafter determined), this court has jurisdiction to exercise all the power that it had in the beginning over the property in Missouri and Oklahoma, and over the reversion of the property in Kansas, to prevent the depreciation of any of that property by the wrongful acts of any one.

The court is also of the opinion that under section 21, chapter 238, of the Session Laws of 1911 of Kansas, in accordance with the opinion of the Supreme Court of Kansas, this is a competent court to which the receiver may apply for the purpose of determining whether or not the rates established by the commission in Kansas are compensatory, reasonable, or confiscatory, and that for this reason there is jurisdiction in this court to hear and determine the question suggested in the dependent bill.

It is urged that the receiver is estopped from applying to this court, because it is decided by the Supreme Court of Kansas, as it is claimed, that he is not engaged in interstate commerce in that state, but in intrastate commerce. It is not necessary to determine the question of res adjudicata in order to determine the question of the jurisdiction of this court, because, if he is not engaged in interstate commerce, still if these rates are noncompensatory, unreasonable under the Kansas statute, or if they are confiscatory, thus in violation of the Constitution of the United States, the jurisdiction still inheres. It is said that in the Kansas case the receiver claimed that he was doing an intrastate business, while he now claims that he is doing an interstate business; but it is not inconsistent with the fact that he is doing an interstate business that he is also doing an intrastate business; and it is not thought, though he may have urged that he was doing an intrastate business there, that that fact is inconsistent with or can estop him from urging here, if it be material, that he is doing an interstate business in Kansas.

It is said that the receiver had a remedy at law in the mandamus case in Kansas, in the state court, and that consequently there is no jurisdiction of this court in equity, because one may not apply to a court of chancery where he has a plain and adequate remedy at law. The answer is: First. The remedy at law, which will prevent the appeal to a national court of equity, must be a remedy at law in a national court. A remedy at law in a state court will not ordinarily have that effect. And, second, in order to bar the remedy in equity, the remedy at law must be as prompt, complete, efficient, and adequate as the remedy in equity which the court of equity may grant. The remedy at law which might have been obtained in the mandamus case is neither of these, and for that reason it does not bar the remedy in equity in this court, if there be facts to sustain the application.

It is insisted that the fact that the receiver put in force the 28-cent

rate fixed by the Kansas commission is a bar to its application to this court to consider whether or not the rate is compensatory, or confiscatory, or violative of or an interference with interstate commerce, and that for that reason he may not apply to this court. But it has frequently been the practice of the courts, when one came to it to ask such equitable relief as is here sought, to require as a condition to listening to the application that the rates fixed by the commission should be first tested, and then the matter should be determined as to whether or not they were confiscatory. And it cannot be that a course that has become so common with the courts, and an act which they have frequently required a litigant to do before he should be heard in his appeal to them, can deprive a litigant of the right thus to appeal for relief.

The Missouri defendants claim that they are not within the jurisdiction of this court, because the process of this court was served on them within the state of Missouri, and not within the state of Kansas. The court is of the opinion that this is one of those cases referred to in section 56 of the Judicial Code, that the original jurisdiction which this court obtained by the filing of the original bills and the appointment of the receivers in the original suits still inheres in this court, subject, as has already been said, to the operation of the property in Kansas temporarily until that court shall have discharged its duty in the anti-trust case, and that the power which was invested in this court by the filing of those bills and the orders thereon, copies of which were filed in the federal courts in Oklahoma and Missouri, gave to this court the power to issue its process in any suit brought in aid of the original suits, for the purpose of the protection and administration of the property, to any of the jurisdictions which were ancillary to the original jurisdiction in those suits, and consequently to the defendants in the state of Missouri. This statute says:

"In any case coming within the provisions of this section, in which a receiver shall be appointed, process may issue and be executed within any district of the circuit in the same manner and to the same extent as if the property were wholly within the same district."

Missouri is within this circuit, and the court is of the opinion that the process was properly issued and served. The court is of the opinion that it has jurisdiction of this dependent suit, brought in aid of the original suits, and that it has the power, and that the duty is imposed upon it, to consider whether or not the charges made in the dependent bill are true, and whether or not it ought, when the facts have been presented to it, to issue its orders to protect the property in its control.

### On Motion for Preliminary Injunction.

After the delivery of the foregoing opinion voluminous evidence was introduced, counsel presented briefs and arguments on the merits of the motion, and after consideration the court delivered the following opinion:

PER CURIAM. John M. Landon is the receiver of the property of the Natural Gas Company, a corporation of the state of Delaware, by appointment of the district court of Montgomery county, Kan., and of the United States District Court of the District of Kansas, and he is operating the business and property of that company under the di-

rection of the former court. That company is directly and indirectly the owner of the pipe line extending from gas fields in the state of Oklahoma to 37 cities in Kansas and 8 cities in Missouri, and by means of the receiver is conducting natural gas from Oklahoma to these cities and their inhabitants, where it is distributed under contracts between the natural gas company and other corporations that for convenience are termed distributing companies. The receiver obtains about 92½ per cent. of his gas from fields in Oklahoma and about 7½ from fields in Kansas. He purchases the gas he obtains from Oklahoma, and produces from leaseholds of the company most of that obtained from fields in Kansas. He supplies about 46 per cent. of his gas to the Kansas cities and towns, and about 54 per cent. of it to cities and towns in Missouri. On December 10, 1915, the Public Utilities Commission of the state of Kansas made an order to the effect, among other things, that the net rates for the sale of natural gas by the receiver to the public in the state of Kansas should be:

"For domestic gas in Montgomery county, 23 cents per thousand cubic feet except at Elk city, where the present rate of 25 cents is to remain; boiler gas in said county 10 cents per thousand cubic feet. In all other counties except those supplied by the Gunn pipe line 28 cents per thousand cubic feet; in the counties supplied by the Gunn pipe line, the present rate of 30 cents per thousand cubic feet; and on all boiler gas, except Montgomery county, 12½ cents per thousand cubic feet."

As the rate of 28 cents named in this order applies to much the larger part of the gas affected by the order, the rates so fixed have been and will be termed the 28-cent rate. The receiver has brought this suit against the members of the Public Utilities Commission of the state of Kansas and the Attorney General of that state to prevent by the injunction of this court the enforcement of the order fixing this 28-cent rate, on the ground that it is unreasonably low, confiscatory of the property and destructive of the business of the natural gas company, and violative of the Constitution of the United States. He has made the distributing companies through which, and the cities to which, he furnishes gas parties defendant. He has also made the members of the Public Service Commission of the state of Missouri parties defendant, and has set forth a complaint and prayed an injunction somewhat similar against them. After the commencement of the suit an application for an interlocutory injunction against the enforcement of the rates fixed by the orders of the commissions was made and has been heard in accordance with the provisions of section 266 of the Judicial Code as amended (Act March 4, 1913, c. 160, 37 Stat. 1013 [1 U. S. Comp. Stat. § 1243, p. 519]).

[2] The crucial question for decision upon this application for an injunction by the court constituted under section 266 is whether or not the 28-cent rate is confiscatory or unreasonably low. Ten days have been devoted to the reception of evidence and the hearing of arguments. Time has been taken for examination of evidence and briefs and for deliberation and consultation. Many issues of fact and of law have been presented that were proper for consideration, but that are not controlling of the decision of the question at issue. The act of Congress requires that the hearing on this application "shall be given precedence and shall be in every way expedited," and the situation of

the property in the hands of the receivers and of the parties to this litigation is such that delay may be as fatal to the interests of all concerned as an adverse decision. For these reasons the court pretermits reference to matters that are not indispensable to the determination of the crucial question in hand, as well as discussion of those that are indispensable to such a question, and confines itself to a statement of the conclusions which the law and the evidence in its opinion compel.

One of the bases of the conclusion and order of the commission is the following table, which is copied from its opinion:

### Table No. 5—Kansas Natural Gas Company.

Statement of Estimated Revenue and Requirements for the Ensuing Year, Based on 1914 Figures, Revised as Previously Explained, for the State of Kansas.

| Requirements. | Transportation. | Kansas. |
|---|---|---|
| 25,671,445 M. cubic feet gas at 4c | $1,026,857.80 | $ 514,045.01 |
| Operating expenses and taxes assigned to transportation | 510,536.14 | 223,245.11 |
| Receivership expenses | 32,228.00 | 14,093.30 |
| Uncollectible gas accounts | 12,555.07 | 6,359.14 |
| Taxes, Kansas City pipe line | 32,288.27 | 16,860.51 |
| Taxes, Marnet mining company | 10,497.35 | 5,316.91 |
| Maintaining organization, Marnet Mining Company | 690.20 | 349.59 |
| Total | $1,626,652.83 | $ 780,269.57 |
| 1 Present value of transportation property, $7,083,605.64; depreciation on basis of twelve years | 590,300.00 | 268,468.44 |
| Requirements exclusive of a return on property investment | $2,216,952.83 | $1,048,738.01 |

1Return on present value........ $7,083,605.64
Add for working capital......... 200,000.00
　　　Total ...................... $7,283,605.64

| | | |
|---|---|---|
| at 6% | 437,016.35 | 198,755.00 |
| | $2,653,969.18 | $1,247,493.01 |

### Estimated Revenue.

| | |
|---|---|
| Gas sales, 1914 | $1,192,089.82 |
| 2 Gas used in compressor station (on basis of use) | 31,737.70 |
| Total | $1,223,827.52 |
| Estimated revenue from proposed increased rates | 171,513.63 |
| Total estimated revenue from Kansas | $1,395,341.15 |
| Deduct requirements as above | 1,048,738.01 |
| Estimated net revenue | $ 346,503.14 |

Which is equal to a return of 10.46 per cent. on the present value $3,312,583.83, which is 45.48 per cent. to Kansas of the total of $7,283,605.64 or

| | |
|---|---|
| Total estimated revenue for Kansas | $1,395,341.15 |
| Less requirements including a 6 per cent. return | 1,247,493.01 |
| Surplus | 147,848.14 |

1 The division of these items between Kansas and Missouri has been made on the basis of the use of the property as shown in Table 1.

2 This item is placed here to balance an equal sum included in the expenditures. It is a bookkeeping entry solely.

The commission found the reproduction value of the property of the gas company, less depreciation for age and use, to be $7,083,605.64, the probable life of the going concern to be 12 years, amortized the $7,083,605.64 by the allowance of one-twelfth thereof, $590,300, as a yearly requirement for its operation, and allocated all the requirements between Kansas and Missouri on the basis of 45.48 per cent. to Kansas and 54.52 per cent. to Missouri. The evidence before the commission, a great volume of evidence which was not before the commission, including a disclosure of the actual results of the operation of the property during the first four months of the year 1915 under the 25-cent rate, which existed before the commission established a 28-cent rate, and the results of its operation during the first four months of the year 1916 under the 28-cent rate, evidence of the exhaustion of gas fields, of the increase of the cost of gas, of the value of the property of the company, and of every other conceivable issue relative to the general question has been presented to this court. Upon nearly every issue this evidence is conflicting and the determination of some of these issues is difficult. "And yet," as the Supreme Court said in Chicago, Milwaukee & St. Paul Ry. Co. v. Tompkins, 176 U. S. 167, 172, 20 Sup. Ct. 336, 338 (44 L. Ed. 417) "this difficulty affords no excuse for a failure to examine and solve the questions involved." Bearing this caution in mind, and conceding the present value of the property of the company to be $7,083,605.64, as the commission found it, a deliberate consideration of the entire case has forced our minds to these findings and conclusions, which in our view are determinative of the real question to be decided.

A supply of gas adequate to the reasonable needs of the customers of the natural gas company for domestic lighting, cooking, and heating is the real desideratum in this case. Without it no rate will be compensatory. The company now has no such supply. It cannot get such a supply without adequate extensions to its pipe lines. It can make such extensions by the expenditure of a reasonable amount of money. It cannot make such extensions without such money, and it cannot get the money to make them without compensatory rates for the gas it procures and sells. Any rate which will not compensate it for making the necessary extensions to secure such a supply, for paying its other necessary expenses of operation and a reasonable income on the value of its property, is unavoidably confiscatory, because without these extensions it must lose its customers, cease its operation, and the value of its property must greatly decrease.

In the earlier years of its operation the natural gas company produced most of its gas from its leaseholds in Kansas, but the fields so leased have been gradually exhausted until it is able to produce therefrom only about 7½ per cent. of the gas it transports and sells. In order to get gas it has already extended its pipes far into the state of Oklahoma, where it purchases and whence it transports to the cities of Kansas and Missouri 92½ per cent. of its gas. It is conceded that the business of the company is temporary, that the exhaustion of the fields which it can reach with permissible extensions must eventually come, and that the time when it can no longer reach fields from which it can

obtain gas cannot be delayed many years. The creditors' agreement of December, 1914, which provided for the payment of the bonded debts of the company within 6 years and for the expenditure of $1,500,000 for extensions and additional gas supply, indicates that they estimated the life of the company as a going concern at 6 years from that date. The first opinion of the Kansas commission, which was based upon this creditors' agreement, provided for the payment of the bonded debts of the company, except the principal of the second mortgage bonds, within the 6 years, 1915, 1916, 1917, 1918, 1919, and 1920, and for the expenditure by the receiver for extensions and additional gas supplies of $1,-500,000. The life of the company as a going concern is necessarily unknown and unknowable, a matter of opinion, and yet the court must determine what it probably is, and a consideration of the evidence, of the history of the gas fields in Kansas and Oklahoma, of the testimony of witnesses familiar with that history, with the fields, and with the production, purchase, transportation, and sale of gas, has brought the minds of all the members of the court to the conclusion that the probable life of the natural gas company as a going concern is approximately 6 years from this date, June 3, 1916.

The creditors by their agreement provided for an expenditure of $1,500,000 within 6 years from December, 1914, for the extensions of the pipes of the company and an additional supply of gas. The Kansas Commission in its opinion, founded upon that creditors' agreement, made a like allowance. The extensions contemplated have not been made, and the exhaustion of the available gas fields has proceeded for 17 months since the creditors' agreement and for about 11 months since the opinion and finding of the commission founded upon it. In order to procure and maintain a reasonably adequate supply of gas for the coming winter it is necessary for the receiver to extend the pipe lines 50 or 60 miles, and to construct compressors at an aggregate expense of at least $750,000 to $900,000 during the first year after the filing of this opinion. And it is the opinion of the court that, in order to procure and maintain such a supply of gas during the 6 years of the probable life of the company as a going concern, it will be necessary for the receiver to expend for extensions and compressors at least $750,000 the first year and $200,000 in each of the 5 years thereafter, amounting in all to $1,750,000. As the life of the company as a going concern is 6 years, the salvage value of the pipes and other materials at the end of the 6 years, when they will be no longer useful in their places in the ground, is estimated to be $262,500, and deducting this from the $1,750,000 leaves $1,487,500 which must be returned within the 6 years. The commission in its finding and estimates made no allowance for these extensions.

The commission allowed $1,026,857.80 yearly for the purchase of 25,671,445 M cubic feet of gas at 4 cents per cubic foot. Gas is constantly becoming more difficult to procure, the cost of it in the fields has increased and is increasing as the fields one after another are exhausted, and the evidence that has been produced before this court has convinced us that the gas requisite reasonably to supply the customers of the natural gas company will cost at least 6 cents per M cubic foot,

and that on this account there should be allowed as a part of the requirements of the receiver and the company 2 cents more per M cubic foot yearly than the amount which was allowed by the commission; that is to say, $513,428.90.

The commission allowed for interest 6 per cent. annually on $7,283,-605.64, or $437,016.64. The business of and the investment in the property of this gas company is of the most precarious and hazardous nature. Seven per cent. per annum is deemed a just and reasonable allowance on investments in railroads, and in the property of water, artificial gas, and lighting companies of a permanent nature, and at least 8 per cent. per annum should be allowed 'in this case, or an increase of the amount allowed by the commission of 2 per cent. on $7,-283,605.64, or $145,672.10.

The commission allowed $590,300, which is one-twelfth of $7,083,-605.64, for future depreciation of the property of the company, on the basis that the life of the company as a going concern would be 12 years. As the evidence has convinced that its life will not exceed 6 years, there should have been allowed $590,300 more each year during the 6 years than was allowed by the commission.

Turning now to the table of the commission quoted above, the result is that, laying aside other considerations and conceding the substantial correctness of the commission's other findings for the purpose of the decision of this application for injunction, its estimates of the requirements of the company and of the receiver for the first and the succeeding 5 years of the life of the gas company as a going concern were too low by the following amounts:

| | |
|---|---:|
| On account of estimating 12 years, instead of 6 years, as the life of the going concern by | $ 590,300.00 |
| On account of lack of allowance for extensions by | 247,916.00 |
| On account of estimate of cost of gas at 4 cents per M cubic foot instead of 6 cents per M cubic foot by | 513,428.90 |
| On account of allowance of 6 per cent. instead of 8 per cent. interest | 145,672.10 |
| Total | $1,497,317.00 |

The commission assigned to the Kansas property 45.48 per cent. of its estimated revenue and requirements; and 45.48 per cent. of $1,-497,317 is $680,979. The commission estimated that upon the basis stated in its table a surplus of $147,848.14 would be produced. Deducting this estimated surplus from the $680,979, it appears that its estimated revenue falls short by $533,131.10 of producing an amount sufficient to pay the necessary expenses of the maintenance and operation of the property and business of the natural gas company and a reasonable interest upon the present value of its property.

The experience of the future may, and it is hoped that it will, teach that the necessary requirements of the receiver and the company will be less than those which the evidence convinces the court will be indispensable to provide and maintain an adequate supply of gas for its customers, to operate the business of the company, and to return a fair income upon the value of its property. The opinion of the court can rest only on the evidence before it, and upon that evidence it is

its opinion that a less rate than 32 cents per M cubic foot will be found insufficient to accomplish this result. But even if there are errors in some of the conclusions to which the court has arrived, and even if they are so great as to reduce the necessary increase of the requirements fixed by the commission by one-half, still moneys must be provided for the extensions of the pipes of the company, for which the commission allowed nothing. The amount it allowed for the cost of gas and the interest rate which it fixed were largely too low, 12 years was too high an estimate for the life of the plant, and in the opinion of the court there is no escape from the conclusions that the 28-cent rate is not and will not be compensatory, that, on the other hand, it is unreasonably low, confiscatory, and violative of the Constitution of the United States, and that the complainant is entitled to the interlocutory injunction of this court to prevent its enforcement pending the hearing of this cause upon its merits.

[3] The creditors by their agreement consented that there should be reserved during the year 1915 $500,000 out of the annual earnings for that year and $200,000 annually thereafter for extensions, betterments, and additional gas supply, upon condition that the properties were being operated on a compensatory rate. Those amounts have not been so reserved and applied, and yet $1,000,000 has been paid on the principal of the creditors' debts during these years. Under these circumstances the rights of the public—that is to say, of the customers of the gas company—to a reasonably adequate supply of gas from the receiver and the company, at a rate that is not unreasonably high, are superior to the rights of the creditors to the payment of their debts, and the making of necessary extensions of the pipes and the construction of the requisite compressors to procure and furnish to these customers that reasonably adequate supply must be made primary in the administration of this estate, and the payments upon the principals of debts of the creditors secondary. To this end the issue of the injunction herein will be conditioned upon the giving by the receiver, or by some one on his behalf, of a bond or undertaking in the sum of $750,000, with adequate security, that he will pay no more upon the principals of the debts of the creditors who were parties to their agreement of December, 1914, or to the Fidelity Title & Trust Company, until $750,000 has been invested in the necessary extensions and compressors, and that he will proceed speedily to make them, and will invest therein at least $500,000 within six months after the issue of the injunction herein.

Elaborate arguments have been made and extensive briefs have been submitted on the questions whether the gas which the receiver is buying, carrying, and selling is an article of interstate or of intrastate commerce, whether he is engaged in interstate or intrastate commerce, and, if in the former, whether the rate fixed by the commission directly or indirectly burdens or interferes with interstate commerce. These questions have received examination and consideration. Their decision, however, is not indispensable to the determination of the question before this court, for, if the gas is not an article of interstate commerce, and if the business of the receiver in dealing with it is not in-

terstate commerce, nevertheless this court has plenary jurisdiction to adjudge the issue whether or not the 28-cent rate is unreasonably low, or is confiscatory, and to enforce its adjudication by injunction under the Public Utilities Act of Kansas (Laws of 1911, c. 238, § 21). State v. Flannelly, 96 Kan. 833, 154 Pac. 235, 237.

[4] Rights created or provided by the statutes of the states to be pursued in the state courts may be enforced and administered in the national courts, either at law, in equity, or in admiralty, as the nature of the rights or remedies may require. "A party by going into a national court does not lose any right or appropriate remedy of which he might have availed himself in the state courts of the same locality. The wise policy of the Constitution gives him a choice of tribunals." Davis v. Gray, 16 Wall. 203, 221, 21 L. Ed. 447; Ex parte McNiel, 13 Wall. 236, 20 L. Ed. 624; Darragh v. H. Wetter Mfg. Co., 78 Fed. 7, 14, 23 C. C. A. 609, 616, and cases there cited; Broderick's Will, 21 Wall. 503, 520, 22 L. Ed. 599; Cowley v. Railroad Co., 159 U. S. 569, 583, 16 Sup Ct. 127, 40 L. Ed. 263.

[5] Discussion of these questions is therefore omitted, but the members of the court are unanimously of the opinion: (1) That the gas purchased or procured in Oklahoma, transported from Oklahoma, and sold or delivered by the receiver or by the gas company to parties in Kansas or Missouri, is an article of interstate commerce, as is the gas procured in Kansas and sold or delivered by them, or either of them, to parties in Missouri; (2) that this gas, which is probably at least 95 per cent. of all the gas the receiver or the company handles, does not lose its interstate character by the fact that a small portion, probably not exceeding 4 per cent., of the gas they handle is procured and delivered in Kansas, is an article of intrastate commerce, and is inseparably mingled in the pipes with the interstate gas; (3) that the purchase or procuring of interstate gas in Oklahoma, its transportation, sale, and delivery by the receiver, or the gas company, to parties in Kansas and Missouri, is interstate commerce, and the receiver and the company are engaged in interstate commerce; (4) that the enforcement by a state through its officers of any legislative act preventing interstate commerce in this article of interstate commerce, either by a direct prohibition of such commerce in this article by state law, or by an inhibition of a sale of the article in the state at any price whatever, or at any price above a price so low that the laws of trade make it impossible to purchase or procure it in another state and to sell and deliver it in the prohibiting state at that price with profit, substantially burdens and unduly interferes with interstate commerce in violation of the commerce clause of the Constitution of the United States.

[6] Counsel for the Public Utilities Commission of Kansas argue that the issues relative to the interstate or intrastate character of the business and gas of the receiver are rendered res adjudicata between him and the commission by the judgments of the Supreme Court of Kansas in State ex rel. Caster v. Flannelly, 96 Kan. 372, 152 Pac. 22, and State ex rel. Caster v. Flannelly, 96 Kan. 833, 154 Pac. 235, to which the receiver and the commission were parties, and in which

that court in its opinions expressed the view that this business and this gas was not of an interstate character. But reasons given by courts in their opinions for conclusions they reach, which are not necessary to and are not embodied in or made parts of the adjudications which they render, do not work the estoppel of res adjudicata. One of the judgments of the Supreme Court in the case mentioned was founded on its decision that Judge Flannelly had no jurisdiction of the case before him, for the sole reasons that the summons against the commission and its members, and the service thereof, were unauthorized and void. The other judgments were the denial of the petition of the receivers for an injunction against the commission to prevent it from putting the 28-cent rate in force, and this was founded on the ground that the receiver had already voluntarily put it in force and no longer pressed in that court for relief against it, and the other was the dismissal of the mandamus proceeding because there was no longer any function for it to perform. The opinion and conclusion that the business and the gas of the receiver were not of an interstate character was unnecessary and immaterial to any of these judgments, and for that reason the court is of the opinion that the questions in relation to the interstate or intrastate character of the business or gas of the receiver and of the natural gas company were not rendered res adjudicata by the adjudications of the Supreme Court of Kansas in the cases to which reference has been made.

Now as to the Missouri defendants: First, have the receivers established their right to the preliminary injunction prayed against the Missouri Public Service Commission? In paragraph 2 of the bill it is alleged that on September 27, 1915, the Public Service Commission of Missouri held a conference with the Public Service Commission of Kansas, after which John M. Atkinson, as chairman of the Missouri Commission, and for the commission, announced that the Missouri Commission would not permit a higher rate to be charged in the cities of Missouri than was charged in the border cities of Kansas. In support of this allegation affidavits were introduced, from which it appears that about September 28, 1915, the three members of the Kansas Commission and two members of the Missouri Commission, held a private conference in the Baltimore Hotel at Kansas City, Mo., after which one of the members of the Missouri Commission stated that:

"If application is ever made to the Missouri Commission for an increase of natural gas rates in these Missouri cities which are supplied with gas by distributing companies buying from the Kansas Natural, no action will be taken until all the cities have been given a hearing. Neither will the commission, if called upon to take action, agree to a higher rate in Missouri cities—all of which are upon the border—than in cities of Kansas similarly situated. This applies with particular force to Kansas City, Mo., and Kansas City, Kan., which the commission regards as practically one city."

Certainly this statement of a single member of the commission, made under these circumstances, outlining what he believed would be the action of the commission in the future in case the question of these rates should be brought before it, furnishes no ground in itself for the granting of the injunctive relief prayed.

It is further alleged that on September 13, 1915, the local distribut-

ing companies of Oronogo and Carl Junction, Mo., filed with the Missouri Commission schedules prescribing a rate of 30 cents for each of those towns, which the commission suspended, and has ever since refused to permit said rates to be put into effect. Under the law of that state the commission may, upon the filing of a proposed schedule of rates, suspend its operation pending a hearing. It does not appear that a hearing as to these last-mentioned rates has ever been had, so that it cannot be said what will be the action of the commission as to such rate, and it further appears that the applications for the allowance of such schedules have been since withdrawn.

So far as concerns the case of the plaintiff, the receiver, against the Missouri Commission, as to the order of the Missouri Commission in relation to the St. Joseph rates, it will be noted that the order of the Missouri Commission complained of was entered at a proceeding to which neither the receiver nor the Kansas Natural Gas Company was a party. The order entered in that proceeding was directed only against the St. Joseph Company. In the course of its opinion the commission said:

"The company [St. Joseph Company] has been paying the Kansas Company 26⅔ cents per thousand cubic feet, while other distributing companies are paying 16⅔ cents, except the local company in Kansas City, Mo., which pays 16.87 cents. The Kansas Company is not before us, and we have no jurisdiction over the contract between that company and the defendant, under which the latter receives its gas from the former. However, it is well recognized that in rate-making cases only reasonable charges, as operating expenses, will be allowed against the public. * * *"

The increase from 40 to 60 cents, prayed by the St. Joseph Company, was denied. There is nothing in the order of the Missouri Commission to prevent the receiver continuing to collect from the St. Joseph Gas Company his proportion of the rate as provided by the contract. So long as the St. Joseph Company continues to collect the 40-cent rate the receiver may under his contract collect as his proportion the 26⅔ cents. A consideration of all the evidence does not convince us that 26⅔ as the proportion of the St. Joseph rate received by the receiver is unreasonably low, noncompensatory, unremunerative, or confiscatory. Therefore no ground is shown in reference to the Missouri Public Service Commission's order regarding St. Joseph rates that entitles the receiver to the preliminary injunction prayed.

[7] So far as concerns the application of the St. Joseph Gas Company for an interlocutory injunction as against the Attorney General of the state of Missouri and the officers of the Public Service Commission of that state as prayed in what it terms its intervening bill of complaint in this case, it appears that to the original bill of the receiver, plaintiff, both the St. Joseph Gas Company and the Attorney General and Public Service Commission of Missouri were made parties defendant. By its answer filed in this case on January 28, 1916, the St. Joseph Gas Company states that it has no knowledge, save as is alleged in said bill, as to the several allegations thereof, and leaves the complainant, receivers, to make such proof thereof as they may be advised is material, and further states that it has no interest in the result of the receiver's suit or in the matters to be litigated herein, and

specifically disclaims any such interest, and prays to be dismissed, with its costs. At the hearing upon the application of the receiver in Kansas City, the St. Joseph Gas Company, through counsel, asked and was granted leave within a certain time thereafter to file an intervening bill.

It has now filed what it styles its intervening bill of complaint, and upon the allegations therein contained it bases its application for the interlocutory order above referred to. The Attorney General of Missouri and the Public Service Commission of that state challenge the jurisdiction of this court in this cause to grant such relief to the St. Joseph Gas Company. In view of the fact that that company and the aforementioned Missouri defendants were all made parties to the original bill, what the St. Joseph Gas Company terms its intervening bill is in reality a cross-action or cross-bill against its codefendants, the Attorney General and the Public Service Commission of Missouri.

In Stuart v. Hayden, 72 Fed. 402, 18 C. C. A. 618, the Circuit Court of Appeals for this circuit said:

"A cross-bill is brought either to aid in the defense of the original suit or to obtain a complete determination of the controversies between the original complainant and the cross-complainant over the subject-matter of the original bill. If its purpose is different from this, it is not a cross-bill, although it may have a connection with the general subject of the original bill. It may not interpose new controversies between codefendants to the original bill, the decision of which is unnecessary to a complete determination of the controversies between the complainant and the defendants over the subject-matter of the original bill. If it does so, it becomes an original bill, and must be dismissed, because there cannot be two original bills in the same case. Story, Eq. Pl. § 3890; Cross v. De Valle, 1 Wall. 1, 140 [17 L. Ed. 515]; Ayres v. Carver, 17 How. 591 [15 L. Ed. 179]; Rubber Co. v. Goodyear, 9 Wall. 807, 809 [19 L. Ed. 587]; Stonemetz Printer's Mach. Co. v. Brown Folding Mach. Co. [C. C.] 46 Fed. 851; Fidelity Trust & Safety Vault Co. v. Mobile St. Ry. Co. [C. C.] 53 Fed. 850, 852; McMullen v. Ritchie [C. C.] 57 Fed. 104."

In Gilmore v. Bort (C. C.) 134 Fed. 658, it is said:

"The purpose of a cross-bill is either (1) to obtain a discovery in aid of a defense to the original bill, or (2) to obtain full relief to all the parties touching the matters of the original bill. Story's Eq. Pl. par. 389. And it must be made to appear that a settlement of the controversy presented by the cross-bill is fairly necessary in order to enable the court to fully dispose of the matter of the original bill. It is auxiliary to the original suit, and a dependency upon it, and should not introduce any new or distinct matter not embraced in the original bill. Neither may it introduce new controversies between the codefendants to the original bill, the decision of which is in no way necessary to a complete determination of the controversy between the complainant and the defendants over the subject-matter of the original bill. If it does, it is not a cross-bill, but an original bill, and should be dismissed. Cross v. De Valle, 1 Wall. 5 [17 L. Ed. 515]; Rubber Co. v. Goodyear, 9 Wall. 807 [19 L. Ed. 587]; Stuart v. Hayden, 72 Fed. 402, 18 C. C. A. 618."

The relief sought as set forth in the prayer of what is termed the intervening bill is that, should the court find and decree that the matter of the division of the proceeds received from the consumers for gas sold in St. Joseph or the amount paid by the St. Joseph Gas Company to the Kansas Natural Gas Company, or its receiver, for gas is a matter within the jurisdiction and control of the Public Service Commission of Missouri, that the court should further find and de-

cree that 17 cents per thousand cubic feet, the amount fixed by the Missouri Public Service Commission as the maximum operating charge which it will allow against the public as the cost of gas, is an insufficient and unreasonably small operating charge, the enforcement of which results in the confiscation of intervener's property as set forth in the bill, and that the court find and determine whether 26⅔ cents per M cubic foot is a fair, reasonable, and proper sum to be paid by the intervener to the Kansas Natural Gas Company, or its receiver, for gas, and a fair and reasonable operating charge against the public as the cost of gas, and that the aforementioned Missouri defendants be temporarily and permanently enjoined and restrained from attempting to enforce the provisions of the order and decisions of the Missouri Commission, or authorizing or directing the institution of any suit or action against the intervener, or its officers, agents, or employés, for the recovery of any penalties because of its failure to observe such order.

A careful consideration of the allegations of this intervening bill, which we treat as a cross-bill, convinces us that it neither serves to aid in the defense of the original suit nor to obtain a complete determination of the controversies between the original complainant and the several defendants to the original bill. In our judgment it interposes new controversies between codefendants to the original bill, the decision of which is unnecessary to a complete determination of the controversies between the complainant receiver and the several defendants to the original bill over the subject-matter of that bill. It is in the nature of an original controversy between the St. Joseph Gas Company and the several Missouri defendants, and the fact that in the determination of this controversy it may and probably will become necessary to consider questions very similar to those involved in this case as between the receiver and the several defendants to the original case, makes it none the less a new and distinct controversy, of which, in the present state of the record, we conclude we have not jurisdiction to grant the relief prayed by the St. Joseph Gas Company, and its application for an interlocutory injunction will therefore be denied.

It has not been and is not necessary for this court as at present constituted to determine the validity of the city ordinances, the contracts between the cities and the distributing companies, the contracts between the distributing companies and the Natural Gas Company and the duties and obligations of the receiver under them, in order to adjudicate the issues it was constituted to decide, and for that reason no opinion is expressed or adjudication made concerning them.