LANDON v. PUBLIC UTILITIES COMMISSION OF STATE OF KANSAS et al.

(District Court, D. Kansas, First Division. April 21, 1917.) No. 136-N.

1. COURTS ☞493(2)—SUIT BY RECEIVER—ORDER OF STATE COURT.

Where, at suit of receivers for a natural gas company appointed by a state court, a federal court granted a preliminary injunction, restraining the enforcement of rates fixed by the state Public Utilities Commission, it was appropriate for the state court to make an order establishing temporary rates to be charged by its receivers, and such order does not affect the jurisdiction or power of the federal court to proceed to final decree in the injunction suit.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1347.]

2. GAS ⬅14(1)—RATES—SUIT BY RECEIVER—GROUNDS FOR DISMISSAL.

    Various motions by defendants to dismiss such suit, made on final hearing, considered, and on the facts *held* not well taken.

    [Ed. Note.—For other cases, see Gas, Cent. Dig. § 10.]

3. GAS ⬅14(1)—NATURAL GAS COMPANY—REGULATION OF RATES—CONSTITUTIONALITY.

    Evidence considered, and *held* to establish that the rates to be charged by the Kansas Natural Gas Company, or its receiver, to consumers in the state, as fixed by Laws Kan. 1911, c. 238, § 30, which were limited to those in force on January 1, 1911, and also the flat rate of 28 cents per 1,000 feet fixed by the Public Utilities Commission by order of December 10, 1915, are both noncompensatory, unreasonably low, and confiscatory, and in violation of the Constitution of the United States.

    [Ed. Note.—For other cases, see Gas, Cent. Dig. § 10.]

4. COMMERCE ⬅61(3)—"INTERSTATE COMMERCE"—TRANSPORTATION AND SALE OF NATURAL GAS—STATE REGULATION OF RATES.

    Natural gas, procured by a company or its receiver in one state, and piped into and sold in another state, the greater part of its cost to the company at the place of sale being the expense of transportation, is an article of "interstate commerce," and does not lose that character because it is mixed in the pipes with a small quantity of gas procured in the state in which it is sold. The company or receiver conducting such business is engaged in interstate commerce, and although the gas is distributed to consumers through local companies, which receive an agreed share of the proceeds, the enforcement by the state in which the sales are made of any law or regulation fixing the price to consumers, which substantially burdens the business or renders it impossible to conduct it at a fair profit, is an undue interference with interstate commerce, in violation of the commerce clause of the federal Constitution.

    [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 81–83, 89.

    For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

In Equity. Suit by John M. Landon, as receiver of the Kansas Natural Gas Company, against the Public Utilities Commission of the State of Kansas; Joseph L. Bristow, C. F. Foley, and John M. Kinkel, as the Public Utilities Commission of the state of Kansas; H. O. Caster, as attorney for the Public Utilities Commission of the state of Kansas; S. M. Brewster, as Attorney General of the state of Kansas; John T. Barker, as Attorney General of the state of Missouri; William G. Busby, as counsel for the Public Service Commission of the state of Missouri; the Public Service Commission of the state of Missouri; John M. Atkinson, Edwin J. Bean, John Kenish, Howard B. Shaw, and Eugene McQuillan, as the Public Service Commission of the state of Missouri; John F. Overfield as receiver of the Kansas City Pipe Line Company; the Fidelity Title & Trust Company, a corporation; the Fidelity Trust Company, a corporation; the Delaware Trust Company, a corporation; the Kansas City Pipe Line Company, a corporation; George F. Sharritt, as receiver of the Kansas Natural Gas Company; the Kansas Natural Gas Company; the St. Joseph Gas Company; the Union Gas & Traction Company; the Atchison Railway, Light & Power Company; the Leavenworth Light, Heat & Power Company; the Tonganoxie Gas & Electric Company; the Citizens' Light, Heat & Power Company; L. G. Treleaven, re-

ceiver of the Consumers' Light, Heat & Power Company; the Kansas City Gas Company; the Wyandotte County Gas Company; the Olathe Gas Company; the Ottawa Gas & Electric Company; O. A. Evans & Co.; the Parsons Natural Gas Company; the Elk City Oil & Gas Company; the American Gas Company; the Home Light, Heat & Power Company; the Carl Junction Gas Company; the Oronoga Gas Company; the Joplin Gas Company; the Weir Gas Company; and the Cities of St. Joseph and Weston, Mo., of Atchison, Leavenworth, Tonganoxie, Topeka, Lawrence, Baldwin, and Ottawa, Kan., of Kansas City, Mo., of Kansas City, Merriam, Shawnee, Lenexa, Olathe, Gardner, Edgerton, Wellsville, Princton, Scipio, Richmond, Welda, Colony, Bronson, Moran, and Ft. Scott, Kan., of Deerfield and Nevada, Mo., of Thayer, Parsons, Elk City, Independence, Coffeyville, Liberty, Altamont, Oswego, Columbus, Scammon, Weir City, Cherokee, Galena, and Pittsburg, Kan., and of Carl Junction, Oronogo, and Joplin, Mo. On final hearing. Decree for complainant.

John H. Atwood, of Kansas City, Mo., Robert Stone, of Topeka, Kan., Chester I. Long, of Wichita, Kan., and George T. McDermott, of Topeka, Kan., for plaintiff.

William G. Busby, of Carrollton, Mo., and Alex Z. Patterson and James D. Lindsay, both of Jefferson City, for defendants Public Service Commission of Missouri, its individual members, and John T. Barker, Attorney General of Missouri.

H. O. Caster and Fred Jackson, both of Topeka, Kan., for defendants Public Utilities Commission of Kansas, its individual members, and S. M. Brewster, Attorney General of Kansas.

J. W. Dana and C. E. Small, both of Kansas City, Mo., for defendants Kansas City Gas Co. and Wyandotte County Gas Co.

J. A. Harzfeld and A. F. Evans, both of Kansas City, Mo., for defendant Kansas City, Mo.

William E. Stringfellow, of St. Joseph, Mo., for defendant St. Joseph Gas Co.

T. F. Doran, of Topeka, Kan., for defendants Consumers' Light, Heat & Power Co. and its receiver.

Charles A. Loomis, of Kansas City, Mo., for defendants Ottawa Gas & Electric Co. and other distributing companies.

C. L. Faust, of St. Joseph, Mo., for defendant city of St. Joseph, Mo.

Charles Blood Smith, of Topeka, Kan., for defendant Fidelity Title & Trust Co.

A. M. Baird, of Carterville, Mo., for defendant city of Oronogo, Mo.

E. F. Cameron, of Joplin, Mo., for defendant city of Joplin, Mo.

BOOTH, District Judge. This is a suit in equity, brought by John M. Landon as receiver of the Kansas Natural Gas Company against the Public Utilities Commission of the state of Kansas and numerous other defendants, praying for an injunction against said Commission to prevent the enforcement of an order, commonly known as the 28-cent rate order, made by said Commission December 10, 1915, establishing rates to be paid in numerous cities in Kansas for natural gas

furnished by the plaintiff; also praying for various other relief, partly against the above-named defendant, partly against other defendants. The application for a preliminary injunction was heard before an enlarged court of three judges, pursuant to section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [Comp. St. 1916, § 1243]). A preliminary injunction was granted upon certain conditions. See 234 Fed. 152. The conditions were fulfilled. Thereafter the case was brought on for final hearing, evidence was introduced and submission had upon the issue as to the 28-cent rate, and questions directly involved therein, and the issue as to interstate commerce; the other issues being expressly reserved for future hearing.

A brief summary of the history of the Kansas Natural Gas Company is necessary to a proper understanding of the present case. The company was organized under the laws of the state of Delaware in April, 1904, with a capital stock of $6,000,000. In July, 1905, it obtained a license to do business in the state of Kansas. The principal business of the corporation was the production and sale of natural gas, but it was authorized under its charter to purchase the stock, business, and property of other corporations. Its first gas fields were located in the state of Kansas. Prior to 1912 the company had, by purchase and consolidation with other companies, largely increased its initial holdings. It had by means of various contracts undertaken to supply gas through distributing companies to more than 30 cities in the state of Kansas, as well as certain cities in the state of Missouri, including the cities of St. Joseph and Kansas City, Mo. These contracts were of various types, but, generally speaking, covered a considerable period of years, and provided for increases in the rates at certain fixed dates. They provided, further, for a division of the price paid by the consumers between the distributing company and the Kansas Natural Gas Company, generally on a basis of one-third to the distributing company and two-thirds to the Kansas Natural Gas Company.

For the purpose of completing its lines to Kansas City, Mo., the company had caused to be incorporated the Kansas City Pipe Line Company, and became owner of 50 per cent. of the stock of said company; the other 50 per cent. being owned by the United Gas Improvement Company. Shortly thereafter, in November, 1906, the Kansas City Pipe Line Company leased to the Kaw Gas Company (a subsidiary corporation of the Kansas Natural Gas Company) all of its property for 99 years. In place of this lease a new lease was substituted between the Kansas City Pipe Line Company and the Kansas Natural Gas Company in January, 1908. For the purpose of extending its pipe lines into Oklahoma, the Kansas Natural Gas Company had caused the incorporation of the Marnett Mining Company, and through stock ownership controlled said last-named company. Two issues of bonds had been made by the Kansas Natural Gas Company, first mortgage series and second mortgage series, and one by the Kansas City Pipe Line Company, and one by the Marnett Mining Company. The properties of the three mentioned companies were operated as a unit, and included a continuous pipe line, from the fields in Oklahoma to the two Kansas Citys, with other lines extending to various cities

in Kansas and Missouri. The company, during the year 1912, was supplying natural gas to approximately 150,000 households, and selling for household and industrial uses upwards of 28,000,000,000 cubic feet of gas per annum.

The Kansas Natural Gas Company had, however, in acquiring its properties and extending its system, violated the anti-trust statute of the state of Kansas, and in January, 1912, suit was begun in the district court of Montgomery county, Kan., by the Attorney General of the state of Kansas, against the Kansas Natural Gas Company, the Independence Gas Company, and the Consolidated Gas, Oil & Manufacturing Company. Amongst other relief prayed for was the ousting of the defendants from the exercise of certain corporate powers within the state and the appointment of receivers. The case was heard, and resulted, so far as the Kansas Natural Gas Company was concerned, not in a complete ouster, but in the appointment of receivers, one of them being the plaintiff in the present suit; the order being filed February 17, 1913. Said receivers were to—

"manage the corporate property and business of the said defendant until the perversion and abuses of privileges by said defendant are corrected, so as to protect the rights of all parties, especially all the gas consumers of the defendant company, and all parties interested in the property of the Kansas Natural Gas Company, whether as bondholders, trustees of bondholders, distributers of gas, or otherwise."

Meanwhile, in October, 1912, a suit (No. 1351, Equity) was commenced in United States District Court for the District of Kansas by John L. McKinney, a stockholder and a bondholder of the Kansas Natural Gas Company, alleging the insolvency of said company, and praying the appointment of receivers to take possession of and manage its property and assets. On October 9, 1912, Eugene Mackey, Conway F. Holmes, and George F. Sharritt were appointed receivers. They immediately took possession of the property and began carrying on its business. On February 3, 1913, another suit (No. 1–N, Equity) was commenced in the United States District Court for the District of Kansas by the Fidelity Title & Trust Company, trustee under the first mortgage of the Kansas Natural Gas Company, to foreclose said mortgage, and on the same date the receivership theretofore existing in the McKinney suit was extended to the Trust Company suit, and the same persons were appointed receivers in the latter suit.

Immediately after the appointment of the receivers in the state court, and acting under the suggestion of that court, the Attorney General of the state of Kansas and the receivers appeared in the federal court and urged the prior jurisdiction of the state court, and prayed the federal court for an order directing its receivers to turn the property of the Kansas Natural Gas Company over to the receivers appointed by the state court. Litigation followed, which finally resulted in all of the property of the Kansas Natural Gas Company, whether located in the state of Kansas, Missouri or Oklahoma, being turned over by the federal court to the two receivers of the state court, for the purpose of managing the property and carrying out of the decree of the state court in the anti-trust suit above mentioned. The history of this

litigation may be found in 206 Fed. 772, 209 Fed. 300, 126 C. C. A. 226, and 217 Fed. 187, 133 C. C. A. 181. In the last-mentioned case the court in its opinion said:

"The court below (United States District Court for the District of Kansas) has the right to retain the foreclosure suit and await the progress and disposition of the action in the state court, with power to make such orders and decrees as future exigencies may require."

On January 9, 1915, the United States District Court for the District of Kansas made an order appointing John M. Landon, the present plaintiff, ancillary receiver of the federal court for the properties located in Missouri and Oklahoma. At the present time John M. Landon is the sole receiver of the state court, and is ancillary receiver of the federal court, and George F. Sharritt is receiver under the federal court in the McKinney and Fidelity Trust Company suits; the other receivers having either died or resigned.

By chapter 238 of the Laws of 1911 of the state of Kansas there was established the Public Utilities Commission for the state of Kansas, vested with control over the public utilities and common carriers doing business in the state. Included under the term "public utility" were companies operating plants for the conveyance of oil and gas through pipe lines; also the lessees and receivers thereof. By said act it was provided that the rates charged by public utilities should be published and filed with the Public Utilities Commission. It was further provided that said Commission, either upon complaint of parties or upon its own initiative should have power to investigate such rates, and fix and order substituted therefor other rates, if found necessary. It was further provided that, unless the commission should otherwise order, it should be unlawful for any public utility to collect a greater rate than that fixed on the lowest schedule of rates for the same service on the 1st of January, 1911. The federal court, shortly after the appointment of its receivers in 1912, established a schedule of rates to be charged by the receivers; but this schedule was shortly thereafter suspended by the same court.

In January, 1913, application by the Attorney General of Kansas was made to the Public Utilities Commission to cause an investigation to be made and to fix rates to be charged by the receivers of the Kansas Natural Gas Company. The receivers and numerous distributing companies appeared and asked for changes in the then existing rates. In July, 1913, the Commission made its order denying any increase in rates, and approving and confirming the rates then in effect. Upon a further hearing in July, 1913, the Commission directed the receivers to make certain extensions of the pipe lines into the Oklahoma field, and thereupon the receivers applied to the federal court for directions as to their duties in respect to this order. Upon a hearing the receivers were directed not to comply with the order of the Commission. See 219 Fed. 614. This application and order, it will be noticed, were made prior to the time when the federal court turned over to the receivers of the state court all of the property of the Kansas Natural Gas Company. This was not completely effected until September, 1914.

In December, 1914, various of the parties before the court in the district court of Montgomery county, in the suit brought by the state of Kansas (No. 13476), after consideration and investigation, entered into an agreement, known as the "creditors' agreement," covering certain phases of the financial management of the property of the Kansas Natural Gas Company, while the same should be in the hands of receivers and under the control of the state district court. This creditors' agreement took the form of a stipulation filed in the state district court in case No. 13476. It provided among other things, for the scaling down of the outstanding stock of the Kansas Natural Gas Company from $12,000,000 to $6,000,000. It also provided for the scaling down of certain of the issues of bonds above mentioned. It recited that the opinion of experts, after investigation, was that the life of the gas field would be six years. It therefore provided for the payment of the several bond issues during such period. It provided payment out of earnings for extensions which would be necessary during such period, if the property should be operated at compensatory rates. It provided that application might be made, with the consent of the state court, to the Public Utilities Commission or other public authority, when deemed advisable by the state court. It provided that creditors and lienholders should defer their rights of foreclosure or assertion of liens during the above-mentioned period, provided the agreement was being carried out, subject, however, to the order of the court. This agreement was consented to by the Kansas Natural Gas Company and its auxiliary companies, by the receivers, by the great majority of the bondholders of the several companies, and by the state of Kansas, through its Attorney General.

In April and May, 1915, the receivers, by direction of the district court of Montgomery county, filed a petition with the Public Utilities Commission, requesting the Commission to establish a schedule of joint rates for the distribution and sale of gas by the complainants and the respondents distributing companies. The schedule proposed by the receivers represented a decided advance in rates from the 25-cent rate then in force, and ranged 20, 25, 30, 35, 37, 40 and 45 cents, according to the location of the cities served; distance being one of the elements recognized. A large amount of testimony was taken, and the Commission filed findings July 16, 1915, to the effect that the rate ought to be raised in all markets where the price was 25 cents per 1,000 cubic feet to the flat rate of 28 cents. Included in the evidence before the Commission at that time was the creditors' agreement, and the findings of the Commission were based, to some extent, at least, upon the estimates and figures found in the creditors' agreement. No order was, however, made by the Commission at this time, and the reason given is stated by the Commission itself as follows:

"It developed upon the hearing that more than half the natural gas supplied and marketed by complainants is sold in the state of Missouri. It is conveyed, by means of pipe lines passing through Kansas, to Joplin, Kansas City, St. Joseph, and other cities in our sister state. It would be manifestly unfair to permit complainants to advance the price of gas to their Kansas patrons, unless a corresponding increase were made to consumers in Missouri.

It is conceded that an advance in Kansas, without a similar one in Missouri, would be unavailing for the purposes contemplated by complainants, and they do not desire any advance in Kansas, except as it may be simultaneous with a corresponding one in Missouri. The Commission, therefore, awaits the pleasure and action of the rate-regulating body or bodies of Missouri having jurisdiction of the subject-matter; and if in that state proper and necessary orders be issued, establishing a schedule of rates as herein outlined, an order, effective, if possible, simultaneously, will be issued by this Commission in accordance with the views herein expressed."

Shortly after this decision, the receivers filed in the district court of Montgomery county an application for an injunction restraining the Public Utilities Commission from putting into effect the joint rate proposed in their findings of July 16, 1915. Service having been attempted to be made upon the Commission and the members thereof, special appearance was made on their behalf, and a motion made to quash the summons and the service thereof. Said motion being overruled, a demurrer was interposed by the Commission, also challenging the jurisdiction of the state district court. The demurrer was overruled, and the Utilities Commission elected to stand upon its demurrer. Thereupon testimony was introduced on behalf of the receivers, and on the 27th of August, 1915, the state district court entered its findings to the effect that the 28-cent rate was unreasonably low, and not sufficient to carry out the requirements of the creditors' agreement, and authorized a 30-cent rate to be temporarily established. The court also expressed the opinion that the receivers were engaged in interstate commerce, and furthermore entered an order enjoining the Public Utilities Commission from putting into effect the rates proposed by it in its findings of July 16, 1915. An appeal to the state Supreme Court was taken by the Utilities Commission from the order overruling the demurrer above mentioned. Meanwhile, on August 17, 1915, the Public Utilities Commission filed in the state Supreme Court an application for an alternative writ of mandamus against the judge of the district court of Montgomery county and the receivers of the Kansas Natural Gas Company, praying that said judge be directed to vacate and set aside the order making the Public Utilities Commission a party defendant to the injunction suit, also to set aside the temporary restraining order, also to dismiss the suit itself, and also that the receivers be compelled to perform their legal and public duty in respect to service.

An answer was interposed by the receivers in the mandamus proceedings. These two matters, the appeal of the Public Utilities Commission from the order of the state district court overruling their demurrer, and the mandamus proceedings brought by the Public Utilities Commission in the Supreme Court, were heard together in that court. State v. Flannelly, 152 Pac. 22. On October 4, 1915, the order of the district court overruling the demurrer was reversed; the Supreme Court holding that no jurisdiction had been obtained over the Commission. The writ of mandamus was denied; the court holding that, inasmuch as the Commission had made no order, a writ of mandamus could not properly issue. The court concluded its opinion as follows:

"The demurrer of the Public Utilities Commission to the receivers' petition is sustained, and the injunction against the Commission is set aside. No writ of mandamus will issue at this time. The action in this court is dismissed as to Hon. Thomas J. Flannelly, but is retained as to the defendants John M. Landon and R. S. Litchfield for such orders and judgments as may be hereafter made."

October 7, 1915, the receivers filed with the Public Utilities Commission a petition for rehearing. Further testimony was introduced and the entire matter was considered de novo. December 10, 1915, the Commission filed its findings and order, again finding that 28 cents, with certain exceptions, was a sufficient rate, and authorizing such a schedule to be filed. December 28, 1915, the receivers filed the authorized schedule, which was approved on the same day, and thereafter, on December 29, 1915, the receivers, by direction of the district court of Montgomery county, filed the bill of complaint in this court in the present suit, said suit being designated "136–N, Equity."

On the 3d day of January, 1916, the Public Utilities Commission presented an application in the mandamus proceeding above referred to, asking the state Supreme Court for an injunction restraining the receivers from prosecuting the present suit in the federal court. On January 7, 1916, the receivers filed a petition for removal of the mandamus proceedings from the state Supreme Court to the federal court. On the 3d day of January, 1916, the Public Utilities Commission also filed a supplemental petition in the mandamus proceedings, again asking that the receivers be compelled to perform their official duties and furnish their customers efficient and sufficient service. On January 16, 1916, the state Supreme Court filed a decision denying the petition of the receivers for removal, denying the petition of the Public Utilities Commission for an injunction, and dismissing the mandamus proceedings.

The bill of complaint in the present suit, 136–N, alleges that it is dependent upon and ancillary to the suits above mentioned pending in this court—the McKinney suit, No. 1351, and the Trust Company suit, No. 1–N, Equity. At the hearing upon the application for a preliminary injunction before the enlarged court, the jurisdiction of the court was challenged by the Public Utilities Commission, as well as by other defendants, upon various grounds, set forth at length, either in their answers or in separate motion papers. The court held that it had jurisdiction. Its opinion upon that question is found in 234 Fed. 152, 154. Upon the final hearing the jurisdiction of the court has again been challenged, largely upon the same grounds. So far as the grounds are the same, I do not deem it necessary to make any statement, except the reference to the prior decision already mentioned.

[1] But motions to dismiss on the part of the Public Utilities Commission have also been made from time to time, during the final hearing and upon the final argument, on further grounds, some of them arising since the hearing on the application for the preliminary injunction. Among them are the following:

"That subsequent to the order granting the preliminary injunction an order has been made by the state district court having control of the receivers, in-

structing the receivers as to the rates to be charged by them; that this order changes the basis of the rate-making, and so affects the present suit as to render it impracticable, if not impossible, for the court to proceed to a decision as to the character of the 28-cent rate."

As has been already intimated upon the hearing, it is my opinion that the order of the state district court in question was not of the character attributed to it by counsel for the Commission. It was an or· der fixing rates to be charged by the receivers temporarily. By the preliminary injunction the rates fixed by the Commission were enjoined, and the rates fixed by the statute of 1911, being the ones in force upon January 1st of that year, were also enjoined. It therefore became necessary for new rates to be temporarily fixed, so that the receivers might continue to carry on business. Upon application by the receiver the court made the order above mentioned. That this course of procedure, suspending the alleged confiscatory rate during the period of investigation and fixing temporary new rates, is proper, see Love v. Railway Company, 185 Fed. 321, 107 C. C. A. 403; Telephone Company v. Utilities Commission, 97 Kan. 136, 154 Pac. 262.

[2] A further ground for dismissal is that, subsequent to the granting of the preliminary injunction, the control of the stock and bonds of the Kansas Natural Gas Company changed hands, and that the new owners entered into certain agreements with the Utilities Commis·· sion, amongst others, that the suit in the state district court in which receivers had been appointed should be dismissed, and also that the present suit in this court should be dismissed. It appeared, however, upon the argument, that the new owners of the stock and bonds of the Kansas Natural were not parties to the present suit, nor had application been made by them to be made parties, nor was application made by the Utilities Commission that said owners should be made parties. It further appeared that there was a dispute as to what agreements had in fact been entered into between the new owners and the Utilities Commission. It appeared, further, that no order of dismissal had been entered by the state district court. These facts were deemed sufficient for denying the motion to dismiss the present suit in this court.

Still another ground urged for dismissal was that the evidence showed that the relief really sought by the receivers was not judicial, but administrative, and that they were seeking to be relieved from carrying out their obligations in respect to the character of the service to be rendered, fixed by certain franchise contracts, and that no relief should be granted in equity until the obligations under the franchise contracts were completely fulfilled. In reference to this contention it is to be observed that the extent of the obligations under the franchise contracts referred to is far from clear, and has not been judi· cially determined; in fact, a judicial determination thereof has been by some of the parties interested studiously avoided, and the Utilities Commission itself has made no order defining the extent of those obligations. Furthermore, in my judgment, the extent of the service

actually rendered by plaintiff is of so large and substantial a character that the failure in some degree to render full and adequate service, especially since this has not been definitely ascertained, ought not, under the peculiar circumstances of the present case, to debar the plaintiff from seeking a determination as to whether the 28-cent rate is confiscatory. To this may be added that it is claimed by the Utilities Commission that never since 1911 has the Kansas Natural Gas Company or its receivers rendered full and adequate service. Nevertheless this has not prevented the fixing of rates by the Commission for such service as has been rendered.

A further ground for dismissal is that the creditors' agreement, above referred to, really provided for an arbitration as to rates by the Utilities Commission, and that this was binding and not subject to review. This contention, in my judgment, is hardly worthy of serious consideration. The most casual reading of the creditors' agreement will show that it is not open to such a construction.

It is also urged on the part of the defendants that the bill should be dismissed for want of equity, because the plaintiffs have not charged for gas in Montgomery county the rate which they were authorized to charge by the order of the Commission, and that the plaintiff cannot be heard to complain of a confiscatory rate so long as they are not charging as high a rate as they are authorized to charge. It is further claimed that the plaintiffs deceived the Supreme Court of Kansas, and led that court to believe that the rate fixed by the order of the Commission of December 10, 1915, had been put into force and effect, when as a matter of fact this was not true, and that the state Supreme Court relinquished its jurisdiction of the mandamus case, being induced, by the deception practiced upon it by the plaintiffs. Counsel for defendant Commission claim that this state of affairs was called to the attention of the federal district court shortly after the present suit was filed, and again at the hearing for the preliminary injunction before the enlarged court, and still again upon the final hearing. If it be true that deception was practiced upon the state Supreme Court, and if that court was led by means of a fraud to relinquish its jurisdiction of the mandamus case, the proper place to make these facts known in the first instance would be in that court itself.

Further, even after the present suit had been begun in this court, the defendants might (at any time before final submission upon the hearing for the preliminary injunction) by proper procedure under section 266 of the Judicial Code have taken action in the state court by mandamus or otherwise, and this court, upon being advised of such action, wouldd have held the present suit in abeyance; but no such course was pursued. Further, the record shows that the rates in question in Montgomery county were competitive rates, and it does not appear that gas could have been sold in that territory by the receiver at a rate higher than 20 cents, the rate then in force; nor does it appear that, if the gas had been brought to Kansas City and sold at 28 cents, there would have been any greater profit for the receiver than by selling it in Montgomery county at 20 cents. Finally, it appears

that the rate in Montgomery county prescribed by the Commission in its order of December 10, 1915, was called to the attention of the state district court shortly after the rates were promulgated, and the district court, upon application of certain cities in Montgomery county, enjoined the receivers from collecting in those cities the rates authorized by the order of the Commission of December 10, 1915. It will be presumed that the state district court in charge of the receivers took the action above mentioned after due deliberation, and that it was duly authorized and for the best interests of all parties concerned, including the financial interests of the receiver.

[3] Passing to the merits. Thousands of pages of testimony and hundreds of exhibits have been introduced, covering almost every possible question that could arise in a rate controversy. Questions involved in the valuation of the plant, questions as to the character and extent of the business, including the available supply of gas and the life of the gas fields, questions as to extensions, questions touching the cost of operation and maintenance, the rate of return proper to be allowed, and the amount of income necessary to meet requirements, have all been covered with great fullness and particularity, both in the evidence and in the arguments of counsel.

It must be borne in mind, however, that this suit is not one for the fixing of a rate to be charged by the plaintiffs for natural gas, but it is a suit to determine whether the 28-cent rate already fixed by the Commission is confiscatory. Bearing this in mind, it becomes apparent that it is not necessary to discuss or determine many of the questions investigated before the Commission and upon which evidence and argument have been offered in this suit. It will not be necessary to determine whether the Commission adopted the best and most scientific method in fixing the 28-cent rate; if that rate is not confiscatory, the method by which it was determined is immaterial here. After determining the value of the plant for rate-making purposes the Commission allocated this value between the states of Missouri and Kansas on a certain percentage basis. The Commission also adopted a flat rate, as distinguished from a distance rate, to cover a great many cities in Kansas. The Commission further divided the valuation of the property into two parts; one covering that portion used for production purposes, and the other that portion used for transportation purposes. Without passing specifically upon the conclusions of the Commission with respect to these several matters, it may be assumed for the purposes of the present discussion that they were justified, but mention of certain matters in connection with some of them will be made later. It will be necessary, however, to consider briefly certain of the matters passed upon by the Commission, in fixing the 28-cent rate.

The value of the property is one of the important elements, and the evidence as to this varied widely, especially as to the value which should be amortized. The evidence shows that the appraisers appointed under the direction of this court in the fall of 1912 found the value of the physical property to be $14,803,200. This did not include

anything for intangibles, going value or working capital. In 1913 Mr. Witt, engineer for the Commission, valued the property as of January 1, 1913, at $10,275,046. This also omitted the above-mentioned items. Mr. Wyer, employed as an expert engineer, by the receivers, fixed the value in 1912 at $14,520,686, excluding the above-mentioned items. In 1915 Mr. Strickler, engineer for the Commission, valued the properties at $8,994,811, excluding the same items. He also valued the properties at $8,602,993, by further excluding the distributing plant at Independence, and the supply lines at Elk City, Independence, and Joplin. Later Mr. Wyer made a reappraisal as of January 1, 1916, fixing the value at $12,000,000, exclusive of the intangibles, going value, working capital, and stock supplies, excluding also the Independence plant and the supply lines at Independence, Joplin, and Elk City.

In July, 1915, the Commission found the value of the physical property to be $8,994,811, and estimated the salvage value as of December 31, 1920, at $2,317,951, which would leave for amortization $6,676,860. In August, 1915, the state district court, in reviewing the figures of the Commission, pointed out certain alleged errors on the part of the Commission in arriving at the salvage value, and estimated that value as of December 31, 1920, at $867,229, which would leave for amortization, $8,127,582. Both of these valuations included the leaseholds. In December, 1915, the Commission fixed the valuation of the property used in transportation (which excluded leaseholds and certain other property) at $7,083,605, amortizing the same on the basis of 12 years, going on the assumption that there would be no salvage at the end of that time. In reference to this matter, the Commission said:

"In providing for depreciation, nothing has been deducted for the salvage value of the property at the end of the estimated life, nor has anything been deducted for the warehouse stock assigned to the transportation branch of the business. In the computations it has been assumed that the entire plant, including the warehouse stock, will be wiped out at the end of the 20-year period. This, of course, is an assumption. At that time it may still be a valuable going concern, or it may be junk."

It would seem that this method of procedure is open to criticism. It is hardly supposable that the property in question could be used and useful in transportation and distribution of gas up to a given date, and then overnight become junk.

Upon a careful consideration of all the evidence bearing upon this question of valuation, I have reached the conclusion that the present fair value of the physical property used in transportation is at least $7,000,000.

Whether anything should be added to the value of the physical property for "going value" is not free from doubt. The term "going value" has been used in many of the reported cases as covering a number of different matters—among them good will; organization costs, such as legal expenses, taxes, and interest during construction; the cost of attaching customers to a completed plant; loss during early

lean years of the business. The expressions "enhanced value" and "development cost" are frequently found in the reported cases, and are helpful in elucidating what is meant by the "going value" for which an allowance has quite properly been made. It will serve no useful purpose to review the numerous cases on the subject; suffice it to say: (1) It seems to be held by the weight of authority that "good will" should not enter into the valuation of a public utility. (2) Overhead expenses during construction period and organization charges are not properly included in "going value," but are a constituent part of the cost of the plant. (3) The other two items mentioned, viz. cost of attaching customers and losses during early years, are legitimate elements of "going value." "Going value," thus understood, might well be added to the physical valuation provided the evidence is sufficiently definite, so that the amount can be fixed with reasonable certainty, and in the absence of countervailing circumstances.

Mr. Wyer, a witness for the receiver, has estimated "going value" at $2,000,000. Mr. Walker, witness for the Commission, has estimated it at $535,000. It appears from the evidence that there was a deficit in the early years; it also appears that no dividends have been paid to the stockholders. But it also appears from the evidence that in the early history of the company upward of $3,000,000 of earnings, instead of being distributed as dividends, was reinvested in the company as capital. Upon a consideration of all the evidence on the subject, I have reached the conclusion that it is very doubtful whether any allowance for "going value" would be justified, and have therefore omitted the same.

Another important element to be considered is the supply of gas. The figures as to this matter which were used by the Commission in December, 1915, in arriving at the 28-cent rate, were approximately the figures for the year 1914, namely, 25,671,445,000 cubic feet. It was considered by the Commission that the receiver would be able to procure the same amount of gas for the year 1915, and thereafter the same figures were adopted as a basis by the enlarged court in the hearing for the preliminary injunction. It is now claimed, however, that the evidence shows that the supply of gas obtainable is very much greater than the figures above mentioned. It is true that the evidence introduced upon the trial has shown the development of new fields having apparently large quantities of gas. Whether these fields will be fairly permanent, or come to a sudden end, no one can foretell. Few of the fields discovered are available to the receiver by the expenditure of a reasonable amount of money; most are available only by the expenditure of a very large amount. The experience of the receiver in making an expenditure of nearly $700,000 under the direction of this court, for the purpose of reaching new fields and increasing the supply, and the results obtained by him, lead to the conclusion that even the best informed men are liable to be sadly mistaken as to future supply. In October the receiver and Mr. Bartlett, who is connected with the Braden interests, both testified as to bright prospects for a

very largely increased supply of gas to be obtained by the Kansas Natural Gas Company within the next 60 or 90 days. At the hearing in February these expectations had given way to certainty; but the certainty was that there would not be an increase, at least to any considerable extent, in spite of diligent efforts.

A consideration of all of the testimony, including the report of this last experience on the part of the receiver, has convinced me that the Commission sitting in December, 1915, and the court sitting in June, 1916, were both justified in taking the figures of 1914 as the maximum supply probably attainable, except upon the expenditure of several times the amount of money they then considered necessary. It is true that Mr. Doherty testified upon the final hearing that he had reasonable grounds for believing that he could furnish a supply largely in excess of the figures of 1914. This expectation, however, was based upon the condition that from $2,000,000 to $2,500,000 should be expended at once in making the necessary extensions, and that further considerable expenditure thereafter would also be made. One of two conclusions appears to be inevitable, either that the supply of 1914 will be the maximum upon the expenditure of such sums as this court in June [1916] thought necessary, or the alternate conclusion that to secure a substantially increased supply will necessitate a very large initial expenditure, followed by others of not inconsiderable amounts.

The life of the fields is also a very important element. This, like the element of supply, is also uncertain. The Commission, in December, 1915, in fixing the 28-cent rate, proceeded upon the assumption that the life of the fields would be 12 years. The experts, upon whose opinion the creditors' agreement was based, estimated the life of the fields at 6 years in December, 1914. In July, 1915, the Commission acted upon the assumption that the life of the fields would be 6 years. The testimony of the experts at the final hearing seemed to be based partly upon known facts and partly upon hopes. Mr. Bartlett, in October, 1916, testified that he thought there was gas enough to last 5 or 6 years, and that possibly the field might exist for 10 years. His testimony was given at a time when he also testified that he, as representing the Braden interests, was expecting to furnish the receiver within the next 30 or 60 days 40,000,000 cubic feet per day. That he was badly mistaken in this latter estimate has been definitely demonstrated within a period of 4 months. Instead of furnishing 40,000,000 cubic feet a day, the average for the past three months has been less than 18,000,000. Mr. York estimated the life of the field under present conditions of use at 4 or 5 years. Mr. Doherty, a man commanding perhaps the fullest information as to gas matters in the Mid-Continent field, testified that he was reasonably certain of being able to furnish the Kansas Natural system a supply of gas very largely in excess of the figures of 1914 for at least 2 years, that he had hopes that it might continue for 3 years thereafter, and that it was not improbable that with further investigations in the Texas and Louisiana fields a supply might be available for even a longer period. Taking

all the evidence together and assuming the present conditions of unrestricted use as between different classes of consumers to continue, the most reasonable conclusion is that the life of the field cannot be fairly estimated at more than 5 years from the present time for a supply equal to that of 1914, and a fortiori not longer for a supply to any considerable extent greater.

As to the cost of gas to the receiver, the Commission, in its investigation leading up to the 28-cent rate, concluded that 4 cents per 1,000 cubic feet would be sufficient. This court, upon the hearing for the preliminary injunction under the evidence then before it, concluded that 6 cents should be allowed. Considerable additional evidence has been introduced touching the price paid for gas in different localities in Kansas and Oklahoma. Mr. Bartlett testified that the price which the receiver would have to pay the Braden interests for gas purchased from them would probably be 7 cents, although it had not yet been definitely fixed. It appears that a royalty of 3 cents exists in the Osage field, where a considerable part of the supply is now obtained by the receiver. While there was evidence that at certain points gas was sold at the mouth of the well for as low as 2 and 3 cents, yet in most, if not in all, of these instances, the wells were not where they were available to the lines of the receiver. It is also in evidence that industrial plants are in active competition at many points with purchasers who are seeking to transport gas to consumers at a distance for domestic purposes, and that in some instances these industrial plants pay as high as 10 or 12 cents for their gas. Viewing the situation as a whole, and taking into consideration all of the evidence bearing upon the matter, the figure of 6 cents adopted by this court in June, 1916, does not, in my opinion, require to be lowered.

As to the rate of return upon investment, the court, upon the hearing for the preliminary injunction, held that 8 per cent. was not excessive, in view of the nature of the business, and the risks, hazards, and prevailing rates in other similar lines of activity. I see no reason for departing from that conclusion, and need not repeat what was then said.

One additional observation may be made. It is conceded by all parties that continued extensions into fields outside of Kansas will be imperative. It has been held that the Public Utilities Commission has no power to order extensions outside the state. It therefore becomes necessary to attract capital to make these extensions. This can be done only upon the basis of a reasonable return in view of the character and risks of the business.

It is to be noted that the 28-cent rate fixed by the Commission was a joint rate; that is, a rate covering both the compensation to the receiver and to the distributing companies, which joint rate was to be paid by the ultimate consumer. Under the contracts made by the Kansas Natural Gas Company with the various distributing companies, a division of the rate to be paid by the ultimate consumer was provided for, which division was generally two-thirds to the Kansas Natural

Company and one-third to the distributing company, although, in a few instances this proportion was different; in the two Kansas Citys it was 62½ per cent. to the Kansas Natural. These contracts between the Kansas Natural and the various distributing companies were never adopted by the receivers appointed by the state court, and the order of the federal court, appointing the original federal receivers, provided that these contracts should not become binding upon the receivers, except by the express order of the court. No such order has ever been made. The receivers, however, continued to distribute gas to the various distributing companies, and to collect therefor upon the ratio of the division of rates fixed by the contracts.

At the hearing before the Public Utilities Commission it was assumed that any joint rate fixed by the Commission would be divided between the receiver and the distributing companies upon the same basis, namely, two-thirds and one-third. At the hearing before the enlarged court, upon the application for a preliminary injunction, the same assumption was made. When the case came on for final hearing, however, the attorneys for the Commission took the position that the assumption would no longer be acquiesced in by the Commission. This, of course, left the question open whether the receiver could reasonably expect to secure a greater percentage of the joint rate fixed by the Commission than the two-thirds. It became necessary to determine this question because, even though it might be established that two-thirds of a 28-cent rate would be confiscatory to the receiver, it would not follow that five-sixths or seven-eighths would be confiscatory. In the absence of an assumption that two-thirds was all that could be obtained, evidence was required as a basis for a finding with regard to the matter. Accordingly, considerable evidence was introduced touching the financial status of the various distributing companies, the valuation of their plants, the character and extent of their business, their operating expenses, and other allied matters. This evidence was introduced, not for the purpose of ascertaining with accuracy what would be a just and fair rate to be charged by the various distributing companies, but solely for the purpose of ascertaining whether there were any reasonable grounds for holding that the receiver could obtain more than two-thirds of the 28-cent joint rate. This evidence was taken and the inquiry made on the basis of laying aside temporarily the contracts between the Kansas Natural Company and the distributing companies, and without undertaking to pass upon the validity of those contracts as between the original parties.

Without reviewing this evidence in regard to these various distributing companies, but after a full and careful consideration thereof, I am clearly of the opinion that there is no reasonable basis for holding that the receiver could obtain more than two-thirds of the 28-cent joint rate, in case that rate should be established.

The Commission, in its decision of December 10, 1915, presented a table showing its estimate of the requirements of the receiver for the

year 1915, and the estimated revenue under the 28-cent rate. The table follows:

### Table No. 5, Kansas Natural Gas Company.

Statement of Estimated Revenue, and Requirements for the Ensuing Year, Based on 1914 Figures, Revised as Previously Explained, For the State of Kansas.

| Requirements. | Transportation. | Kansas. |
|---|---|---|
| 25,671,445 M cubic feet gas at 4¢ | $1,026,857.80 | $ 514,045.01 |
| Operating expenses and taxes assigned to transportation | 510,536.14 | 223,245.11 |
| Receivership expenses | 32,228.00 | 14,093.30 |
| Uncollectable gas accounts | 12,555.07 | 6,359.14 |
| Taxes Kansas City pipe line | 32,288.27 | 16,860.51 |
| Taxes Marnet Mining Company | 10,497.35 | 5,316.91 |
| Maintaining organization Marnet Mining Company | 690.20 | 349.59 |
| Total | $1,626,652.83 | $780,269.57 |
| Present value of transportation property, $7,083,605.64; depreciation on basis of 12 years | 590,300.00 | 268,468.44 |
| Requirements exclusive of a return on property investment | 2,216,952.83 | 1,048,738.01 |
| [1] Return on present value.........$7,083,605.64 | | |
| Add for working capital.......... 200,000.00 | | |
| Total | $ 437,016.35 | $ 198,755.00 |
| | $2,653,969.18 | $1,247,493.01 |

#### Estimated Revenue.

| | |
|---|---|
| Gas Sales 1914 | $1,192,089.82 |
| [2] Gas used in compressor stations (on basis of use) | 31,737.70 |
| Total | $1,223,827.52 |
| Estimated revenue from proposed increased rates | 171,513.63 |
| Total estimated revenue from Kansas | $1,395,341.15 |
| Deduct requirements as above | 1,048,738.01 |
| Estimated net revenue | $ 346,503.14 |

Which is equal to a return of 10.46% on the present value $3,312,583.83 which is 45.48% to Kansas of the total of $7,283,605.64 or

| | |
|---|---|
| total estimated revenue for Kansas | 1,395,341.15 |
| Less requirements including a 6% return | 1,247,493.01 |
| Surplus | 147,848.14 |

The enlarged court, in its opinion in granting the preliminary injunction, pointed out wherein it thought the foregoing table should be revised. It said:

"Turning now to the table of the Commission, quoted above, the result is that, laying aside other considerations, and conceding the substantial correctness of the Commission's other findings for the purpose of the decision of this application for injunction, its estimates of the requirements of the company and of the receiver for the first and the succeeding five years of

---

[1] The division of these items between Kansas and Missouri has been made on basis of use of property as shown in Table No. 1.

[2] This item is placed here to balance an equal sum included in the expenditures. It is a bookkeeping entry solely.

the life of the gas company as a going concern were too low by the following amounts:

| | |
|---|---:|
| On account of estimating 12 years instead of 6 years as the life of the going concern by | $ 590,300.00 |
| On account of lack of allowance for extensions by | 247,916.00 |
| On account of estimate of cost of gas at 4 cents per M cubic feet, instead of 6 cents per M cubic feet by | 513,428.90 |
| On account of allowance of 6 per cent. instead of 8 per cent. interest | 145,672.10 |
| Total | $1,497,317.00" |

Upon the final hearing counsel for the Commission has prepared a table, which is found on page 99 of their brief, which is a revision of the table set forth in the decision of the Commission, based "upon the assumption that the receiver will provide for his consumers 30,000,000,000 cubic feet, instead of 18,000,000,000 cubic feet, of gas per annum. This table thus prepared by counsel is as follows:

| | Transportation. | Kansas. |
|---|---:|---:|
| 39,863,630 M cubic feet, at 6¢ (Kansas 50.06%), allowing for leakage and difference in pressure basis | $2,391,817.80 | $1,197,343.98 |
| Operating expenses and taxes assigned to transportation (increased 66⅔%) | 850,859.53 | 372,060.30 |
| Receivership expenses | 32,228.00 | 14,093.30 |
| Uncollectable gas accounts (increased 66⅔%) | 20,924.28 | 10,598.14 |
| Taxes Kansas City pipe line | 33,288.27 | 16,860.51 |
| Taxes Marnet Mining Company | 10,497.35 | 5,316.91 |
| Maintaining organization Marnet Mining Company | 690.20 | 349.59 |
| Total | $3,340,305.43 | $1,616,622.73 |
| Value of transportation property $7,083,605.64 depreciation on basis of 12 years from December 31, 1914 | 590,300.00 | 268,468.44 |
| Add for extensions, $1,000,000 to be amortized in 10 years, 45.48% to Kansas | 100,000.00 | 45,480.00 |
| Requirements exclusive of a return on property investment | $4,030,605.45 | $1,930,571.17 |
| Estimated revenue on basis of 1914 sales | | $1,395,341.15 |
| Add for increase in business, 66⅔% | | 930,134.38 |
| New estimated revenue | | $2,325,475.53 |
| Requirements as above | | 1,930,571.17 |
| Estimated net revenue | | $394,904.36 |
| Value of transportation property | $7,083,605.64 | |
| Add for new capital | 1,000,000.00 | |
| Add for working capital | 200,000.00 | |
| Total | $8,283,605.64 | |
| Kansas proportion 45.48% | | 3,767,383.83 |

On which value estimated net revenue is an annual return of 10.48%.

For the purpose of summarizing the conclusions reached by me as heretofore stated and putting them in concrete form, in order to show wherein they differ from the conclusions reached by counsel for the Commission, in the revised table above given, the table is again re-

produced, embodying the changes necessary to make it conform to the foregoing conclusions:

|  | Transportation. | Kansas. |
|---|---|---|
| 39,863,630 M cubic feet, at 6¢ (Kansas 50.06%) allowing for leakage and difference in pressure basis | $2,391,817.80 | $1,197,343.98 |
| Operating expenses and taxes assigned to transportation (increased 66⅔%) | 850,859.53 | 372,060.30 |
| Receivership expenses | 32,228.00 | 14,093.30 |
| Uncollectable gas accounts (increased 66⅔%) | 20,924.28 | 10,598.14 |
| Taxes Kansas City pipe line | 33,288.27 | 16,860.51 |
| Taxes Marnet Mining Company | 10,497.85 | 5,316.91 |
| Maintaining organization Marnet Mining Company | 690.20 | 349.59 |
| Total | $3,340,305.43 | $1,616,622.73 |

Value of transportation property less salvage $7,000,000—$1,050,000=$5,950,000.

|  | | |
|---|---|---|
| Depreciation on basis of 5 years from April 1917 | $1,190,000 | 541,312 |
| Add for extensions, 2,000,000 one-half to be amortized in 5 years, 45.48% to Kansas | 20,000 | 90,960 |
| Requirements exclusive of a return on property investment | 4,730,305 | 2,248,794 |

|  | |
|---|---|
| Estimated revenue on basis of 1914 sales | $1,395,341.15 |
| Add for increase in business 66⅔% | 930,134.38 |
| New estimated revenue | 2,325,475.53 |
| Requirements as above | 2,248,794 |
| Estimated net revenue | 76,681 |
| Value of transportation property | $7,000,000 |
| Add for new capital | 2,000,000 |
| Add for working capital | 200,000 |
| Total | $9,200,000 |
| Kansas proportion, 45.48% | $4,184,160 |

On which value estimated net revenue is an annual return of 1.8%.

This falls short of producing 8 per cent. on the investment by $258,051. It falls short of producing 6 per cent. on the investment by $174,368. In this re-revised table no allowance for going value has been included, for the reasons heretofore stated. Furthermore, no valuation is included for leaseholds. The Commission made no allowance for these leaseholds in the valuation fixed by it for rate making, but it made an allowance of 4 cents per thousand cubic feet for whatever gas was obtained from wells covered by the leases.

It is claimed on the part of the plaintiff that this method of dealing with the leaseholds was not only unscientific, but also worked a great detriment to the plaintiff. It must, I think, be conceded, if all gas required by the receiver could be bought at the price of 4 cents per 1,000 cubic feet, that it might be fairly argued that the receiver should not make use of gas obtained from the leaseholds upon a higher basis than 4 cents; but if, as the evidence shows, not only all the gas that could be purchased at 4 cents was needed, but also in addition thereto all the gas produced from the leaseholds, then it might or might not be fair and just to allow 4 cents for gas obtained from the leaseholds. If this last increment of gas from the leaseholds was needed to make up

the supply, a reasonable return should be allowed for it, though this return exceeded the price paid for the rest of the gas. In other words, the leaseholds should logically be valued, and this value amortized, and the valuation added to the capital account upon which returns should be figured. In the present case, if this were done and the valuation used which was placed upon the leaseholds by the expert of the Commission, it will be found that the 4-cent allowance for gas from leaseholds was not equivalent to placing the valuation of the leaseholds in the capital account, and amortizing the same, and giving a fair return upon the capitalization. However, when, as in the foregoing table, 6 cents is allowed as the cost price of gas to the receiver, and this is made also the basis of return for gas obtained from the leaseholds, the difference between the two foregoing methods of handling the leaseholds becomes of very little importance. For this reason it is not thought necessary to make a change in the table of the Commission in this respect.

Allowance has been made for salvage at the end of the five-year period—15 per cent. on the present valuation of $7,000,000 and 50 per cent. on the extensions and additions immediately necessary. The estimated cost of these immediate changes has been reduced by the value of new pipe recently bought by the receiver and not yet used, amounting to something over $200,000. The balance of the amount recently expended by the receiver under order of court, amounting to over $400,000, though unsuccessful as an investment, must nevertheless be provided for, either by being placed in capital account and amortized, or by being charged to maintenance; proper allowance to be made in either case for salvage. This would increase the deficit above shown.

It is further to be noted that in the foregoing re-revised table no allowance is included for extensions after the large initial one. This omission is not due to a conclusion that no such expenditure would be necessary. On the contrary, the testimony shows that it would be necessary; but from the evidence I am unable to deduce any definite figure as to amount. Whatever sum would be necessary to be expended would, of course, increase the deficit to a still greater extent.

Extensions to new gas pools do not stand on the same footing as new branch lines of railway. The one is normally short-lived; the other is normally enduring. The former are usually necessary to maintain the present business; the latter are usually built for the purpose of getting new and additional business. Whether extensions in such a business as the natural gas business should be charged to capital account and amount (less estimated salvage at the end of the life of the field) be amortized, or whether they should be charged immediately to maintenance (subtracting, however, from each installment of investment an amount for estimated salvage), makes very little difference, provided a return is allowed on the capital actually invested during the time it is tied up. In the first instance, however, the feasibility of attracting capital into the extensions may be a determining factor as to how the account should be made up.

Finally, the experience of the receiver for the year 1916 is instructive and valuable. During the first 8 months of the year the 28-cent

schedule was in force, the average return to the receiver on gas sold for domestic purposes was 18.27 cents. The total amount of gas sold during the year on the whole system for domestic consumption was 14,170,692,000 cubic feet. Applying the above rate to this amount, we have given an income of $2,608,824. Income derived from sale of boiler gas, gas for engines, etc., gives $523,700—a total income of $3,132,524. Against this were the following:

Gas purchased..............................................................$1,203,547
Operating expenses....................................................... 910,030
Depreciation or amortization, $7,083,605 on six-year basis adopted
  by court in June 1916................................................... 1,180,600
8 per cent. on investment of $7,083,605............................ 582,698
                                                                                  _____
Total necessary revenue...............................................$3,876,868
Total income above...................................................... 3,132,524
                                                                                  _____
Deficit ........................................................................$ 744,344

In fairness, owing to the abnormally large expenditures for extensions, the figures for operating expenses, $910,030, might well be reduced by $300,000, thus approximating a normal year, leaving a deficit of $444,344.

The foregoing findings and conclusions, though perhaps containing errors, have nevertheless been reached after the most careful consideration of the evidence and the arguments of counsel that I have been able to give. It is accordingly held that the 28-cent rate is not and will not be compensatory, but, on the contrary, that it is unreasonably low and confiscatory, and violative of the Constitution of the United States.

### Interstate Commerce.

[4] The question of interstate commerce remains to be considered. It is claimed by the plaintiff, and by several of the defendants who ask for similar relief, that the transactions carried on by the receiver, namely, the transportation of gas from Oklahoma to Kansas or Missouri, or from Kansas to Missouri, and the sale thereof, at points of destination, constitute interstate commerce, and, further, that under the facts disclosed by the record the Public Utilities Commission of Kansas, in fixing the 28-cent rate, has attempted to directly regulate and control this interstate commerce, and has imposed a substantial burden thereon, and for these reasons the enforcement of its order should be enjoined. On the other hand, counsel for the Commission state their position thus:

"Our position is, however, that the receiver, being a public utility under the laws of Kansas, and actually engaged in a domestic and local business within the state, and employing local franchise in the local sale and distribution of gas, thereby commingling its property with the general property of the state is unquestionably engaged in intrastate commerce, and has unquestionably taken away from the transaction of importing gas into the state and the sale of the same to customers all of the interstate features which might have existed, had the company not employed local agencies for the sale of gas in said state."

It is further claimed on the part of the Commission that the question of interstate commerce is res adjudicata, having been passed upon by

the Supreme Court of the state of Kansas in the case of State ex rel. v. Flannelly, 96 Kan. 372, 152 Pac. 22. This contention on the part of the defendant that the question of interstate commerce is res adjudicata was presented to the enlarged court, and argued at length, upon the application for a preliminary injunction. That court in its opinion took occasion to discuss the matter, and reached the conclusion that the question was not res adjudicata. It is not necessary to repeat what was then said, but it will be sufficient simply to make reference thereto. See 234 Fed. 152.

It is earnestly contended, however, by counsel for the Commission, that sufficient consideration was not given by the court to the fact that the state Supreme Court of Kansas, upon the first hearing in the mandamus matter, No. 20,324, though denying the writ, nevertheless retained jurisdiction. 96 Kan. 372, 152 Pac. 22. The position of counsel for the Commission seems to be that the retention of jurisdiction by the state Supreme Court involved necessarily a finding on the question of interstate commerce, and· rendered that question res adjudicata. There are at least two answers to this contention:

First, the retention of jurisdiction by the state Supreme Court in the mandamus matter was not necessarily based upon such a finding as is now claimed, for there was in the mandamus proceeding another independent matter which did not necessarily involve the question of interstate commerce, namely, the character of the service which the receiver should be compelled to furnish. The mandamus petition contained a distinct prayer for relief in regard to this latter matter. On the first hearing the court could grant no relief in respect to this matter, for the same reason that it could grant no relief in regard to the rate matter, namely, that there was before it no order made by the Commission. That the Supreme Court retained jurisdiction in the mandamus proceeding, partly at least on account of this matter of service, is apparent from the opinion of the court rendered on the second hearing. 154 Pac. 235. At this time, also, it appeared that the Commission had made no order in regard to the character of the service. The Supreme Court said:

"Since it is now conceded that the Public Utilities Commission has made no order requiring the defendants to furnish better or more efficient service, the court would not be justified in granting the writ, nor in longer retaining the proceeding."

Second, there was in the mandamus proceeding no "final judgment"· entered of such a character as would render any question in the proceedings res adjudicata, or which could be carried by the receiver to the Supreme Court for review. See Louisiana Nav. Co. v. Oyster Commission, 226 U. S. 99, 33 Sup. Ct. 78, 57 L. Ed. 138; McLish v. Roff, 141 U. S. 661, 12 Sup. Ct. 118, 35 L. Ed. 893. Furthermore, the Fidelity Title & Trust Company, trustee under the mortgage made by the Kansas Natural Gas Company, was not a party to the mandamus proceeding, and was not bound by the judgment entered therein; and it might, in subsequent litigation to which it was a party, raise any of the questions involved in the mandamus proceeding. See Keokuk & Western R. R. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450; Old Colony Trust Co. v. Omaha, 230 U. S. 100, 33 Sup.

Ct. 967, 57 L. Ed. 1410; Louisville Trust Co. v. Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Williamson v. City of Clay Center, 237 Fed. 329, —— C. C. A. ——. The Trust Company is a party to the present suit, and has at all stages insisted that the business carried on by the receiver is interstate commerce, and not subject to the regulation or control of the Public Utilities Commission of Kansas.

It is also claimed by the defendant Commission that the plaintiff is estopped, because the propositions of law contended for by him as to interstate commerce, and the authority of the defendant Commission, have been settled in this suit. The case relied upon by counsel for the Commission in support of this contention, is McKinney v. Landon, 209 Fed. 300, 126 C. C. A. 226. A careful reading of the decision in that case will show that the questions therein involved and decided were by no means identical with or decisive of the questions involved in the case at bar touching interstate commerce. The questions in reference to this matter of interstate commerce arising in the present case are: (A) Is the plaintiff, in transacting the business of transporting and selling gas, engaged in interstate commerce? (B) If the business thus transacted is interstate commerce, is it nevertheless of such a local character that the state may impose regulations and burdens upon the same? (C) Is the fixing of the 28-cent rate at which gas may be sold in fact imposing upon interstate commerce a burden or a regulation such as the state is not authorized to impose?

(A) In determining the question whether the transactions carried on by the receiver constitute interstate commerce, it will be helpful to have clearly in mind just what those transactions are. The Supreme Court of the state of Kansas in State ex rel. v. Flannelly, supra, has stated the matter as follows:

"The gas sold by the receivers is produced in both Kansas and Oklahoma. It is transported from the wells through pipe lines beginning in Oklahoma, entering the state of Kansas near Coffeyville, at which place gas is first distributed and sold to consumers. The remainder is transported north through pipe lines into which gas from wells in Kansas is conveyed, and the gas from Oklahoma and Kansas is then transported through the same pipe lines and through compressing stations to Independence and north and east throughout this state, and after supplying the consumers in this state it is transported into the state of Missouri, where it is sold to other consumers. After the gas from this state is discharged into the pipe lines with the gas from Oklahoma, it is impossible to distinguish one from the other, or to separate one from the other. About 85 per cent. of the gas sold is produced in Oklahoma, and 15 per cent. is produced in Kansas. About 60 per cent. of the gas sold is sold in Missouri, and 40 per cent. is sold in Kansas. The gas sold in Kansas is delivered to the consumers thereof, in the several cities, by distributing companies operating under franchises obtained by the distributing companies from the cities, fixing the rates to be charged customers for gas. These distributing companies act as the agents for the Kansas Natural Gas Company in the distribution and sale of gas. The price received for gas is divided between the distributing companies and the receivers on a percentage basis. The gas is not sold by the receivers to the distributing companies. It is delivered from the pipe lines of the Kansas Natural Gas Company, under the control of the receivers, into the pipe lines of the distributing companies, and is through these pipe lines conveyed from the pipe lines of the Kansas Natural Gas Company to the consumers. The gas is consumed as fast as it is sold, and is consumed immediately after passing through the meter measuring the gas to the consumers."

Since the decisions in Haskell v. Kansas Natural Gas Co., 224 U. S. 217, 32 Sup. Ct. 442, 56 L. Ed. 738, West v. Kansas Natural Gas Co., 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193, and Haskell v. Cowhan, 187 Fed. 403, 109 C. C. A. 235, it can no longer be open to question that natural gas is a subject of interstate commerce. And it seems to have been admitted by the Supreme Court of Kansas in State ex rel. v. Flannelly, supra, and also seems to be admitted by counsel for the Commission in the case at bar, that transportation of natural gas by the receiver from Oklahoma into Kansas, and thence into Missouri, or from Kansas into Missouri, is interstate commerce; but it is claimed that at some point before the gas reaches the final consumer the transaction has ceased to be interstate commerce, and has lost its character as such. Just at what point this interstate commerce transaction loses its character as such, the Supreme Court of the state of Kansas and counsel for the Commission are not in harmony. The state Supreme Court, in the case above cited, adopted the original package idea, and attempted to apply it to the transaction in question. It said:

"The original package of gas is broken when the first gas is taken out of the pipe lines and sold in this state. Thereafter the gas ceases to be an article of interstate commerce."

And again:

"Interstate commerce is at an end when the bulk of the imported gas is broken up for indiscriminate distribution to individual purchasers at retail sale."

Counsel for the Commission, however, have repudiated the original package idea, and in their brief state:

"There is no original package where the transportation is conducted by means of a pipe line. Gas so conducted is not susceptible of delivery in original package."

The position of counsel for the Commission appears to be that the transaction loses the character of interstate commerce when the gas passes from the pipe lines of the receiver to the lines of the local distributing companies. Nor do counsel for the Commission appear to lay much stress on the fact that about 6 per cent. of the gas distributed in Kansas originates in the same state. In their brief they state:

"We say simply that the character of this service cannot be destroyed or explained away by the fact that any amount, or indeed, all the amount, of the gas distributed locally by the Kansas Natural Gas Company and its agents was obtained in other states than Kansas. Such service is still a local service, not interstate in its character, and is subject to local regulation."

Bearing in mind the character of the business actually carried on by the receiver and the contentions of the parties in reference to the same, let us examine some of the adjudicated cases. Most of the cases which involve the question whether a particular transaction constitutes interstate commerce deal with three separate parties: A shipper, a carrier, and a consignee. The language used in the cases is usually framed in reference to that state of affairs. However, as will be noted later on, the existence of three such separate parties is not essential to an interstate transaction.

The following propositions, which have a bearing upon the instant case, seem to be well established:

(1) Interstate commerce begins when the goods are delivered to the carrier for transit from a point in one state to a point in another state, or are actually started on their ultimate passage. Coe v. Errol, 116 U. S. 517, 525, 6 Sup. Ct. 475, 29 L. Ed. 715; General Oil Co. v. Crain, 209 U. S. 211, 229, 28 Sup. Ct. 475, 52 L. Ed. 754; T. & N. O. R. Co. v. Sabine Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442; La. Ry. Com. v. Railway, 229 U. S. 336, 33 Sup. Ct. 837, 57 L. Ed. 1215; Ill. Cent. Ry. Co. v. La. Ry. Com., 236 U. S. 157, 35 Sup. Ct. 275, 59 L. Ed. 517; McCluskey v. Ry., 243 U. S. 36, 37 Sup. Ct. 374, 61 L. Ed. 578.

(2) Interstate commerce ends when the shipment reaches its intended destination, and, except where Congress has expressly otherwise provided, the protection afforded to an interstate shipment includes the right to sell by the person introducing the goods, at least up to the time when they have become commingled with the general property of the state, and, where the goods are introduced in the original packages, commingling does not take place until the original package is broken. Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Am. Exp. Co. v. Iowa, 196 U. S. 133, 25 Sup. Ct. 182, 49 L. Ed. 417; Savage v. Jones, 225 U. S. 501, 520, 32 Sup. Ct. 715, 56 L. Ed. 1182.

(3) The intent and purpose of the party making the shipment have an important, if not controlling, bearing upon the question of where the interstate journey ends. Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; So. Pac. Term. Co. v. Int. Com. Com., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310; Ohio Ry. Com. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004; T. & N. O. R. Co. v. Sabine Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442; La. Ry. Com. v. Ry., 229 U. S. 336, 33 Sup. Ct. 837, 57 L. Ed. 1215; Ill. Cent. Ry. v. La. R. R. Com., 236 U. S. 157, 35 Sup. Ct. 275, 59 L. Ed. 517; United States v. Ill. Cent. Ry. (D. C.) 230 Fed. 940.

(4) A change of carriers or plurality of carriers does not affect the status of the interstate shipment. T. & N. O. R. Co. v. Sabine Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442; So. Covington Ry. v. Covington, 235 U. S. 537, 35 Sup. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792; Atchison Ry. v. Harold, 241 U. S. 371, 36 Sup. Ct. 665, 60 L. Ed. 1050.

(5) Change of ownership of the property during transit does not necessarily affect the status of the shipment. Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Gulf Ry. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540; Atchison Ry. v. Harold, 241 U. S. 371, 36 Sup. Ct. 665, 60 L. Ed. 1050.

(6) Employment of an agent at the point of destination to effect delivery to the ultimate consignee does not destroy the character of the shipment. Caldwell v. North Carolina, 187 U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336; Rearick v. Pennsylvania, 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295; Stewart v. Michigan, 232 U. S. 665, 34 Sup. Ct. 476, 58 L. Ed. 786; Davis v. Virginia, 236 U. S. 697, 35 Sup. Ct. 479, 59 L. Ed. 795; Grand Union Tea Co. v. Evans (D. C.) 216 Fed. 791.

(7) The time and place at which the title to the goods passes, as be-

tween the seller and buyer, is not controlling upon the character of the shipment. Norfolk Ry. v. Sims, 191 U. S. 441, 24 Sup. Ct. 151, 48 L. Ed. 254; Penn. R. R. v. Coal Co., 238 U. S. 456, 468, 35 Sup. Ct. 896, 59 L. Ed. 1406; Penn. R. R. v. Sonman Co., 242 U. S. 120, 37 Sup. Ct. 46, 61 L. Ed. 188.

(8) The parties, shipper, carrier, and consignee, may be three separate parties, or a less number. Kelly v. Rhoads, 188 U. S. 1, 23 Sup. Ct. 259, 47 L. Ed. 359; Rearick v. Pennsylvania, 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295; Ohio R. R. Com. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004; Stewart v. Michigan, 232 U. S. 665, 34 Sup. Ct. 476, 58 L. Ed. 786; Oil Pipe Line Cases, 234 U. S. 548, 34 Sup. Ct. 956, 58 L. Ed. 1459; Kirmeyer v. Kansas, 236 U. S. 568, 35 Sup. Ct. 419, 59 L. Ed. 721; City of Lee's Summit v. Jewell Co., 217 Fed. 965, 133 C. C. A. 637.

(9) Absence of a specific consignee at the time of shipment does not alter the character of the shipment. Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; T. & New Orleans R. Co. v. Sabine Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442; Grand Union Tea Co. v. Evans (D. C.) 216 Fed. 791.

(10) The exact destination need not be fixed at the time of the shipment, provided the intent and purpose is to continue the journey beyond the limits of the state in which the journey begins. Ohio R. R. Co. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004; T. & N. O. R. Co. v. Sabine Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442.

Reverting to the character of the business transacted by the receiver, it is to be noted: (a) That the shipment is started on its journey from one state to another, (b) with the purpose that it shall be delivered to a consumer. (c) That it moves continuously from a point of shipment in one state to the consumer in another state. (d) That it is moved part of the way in the pipe lines of the receiver, and part of the way in the pipe lines of the distributing company, whether as agent of the receiver or as connecting carrier is immaterial. (e) The destination of the shipment is intended at the time of the shipment to be beyond the state, although the name of the particular consumer for any specific portion of the gas shipped is not known. (f) There is no stoppage in transportation. (g) The title to the gas remains in the receiver until delivery to the ultimate consumer.

In substance and effect there are continuing orders by the consumers to the receiver through the distributing company to supply them with gas from the Oklahoma fields. Such transactions have the character of interstate commerce at their inception, and this character continues until final delivery. Crenshaw v. Arkansas, 227 U. S. 389, 33 Sup. Ct. 294, 57 L. Ed. 565, and cases cited. Even though the shipment is started before a definite order for a specific amount is given, still, the continuous and usual course of business determines the character of the shipment. Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Grand Union Tea Company v. Evans (D. C.) 216 Fed. 791.

Applying the foregoing principles to the facts in the case at bar, the conclusion follows that the transportation of gas carried on by the re-

ceiver is interstate commerce, and that the character of the business inheres from the beginning of the journey in Oklahoma to the termination thereof at the burner tips in Kansas or Missouri.

(B) It is claimed, however, by the Commission, as above noted, that though the business of transporting gas by the receiver from Oklahoma to Kansas and Missouri may be interstate commerce in its inception, nevertheless it loses that character by reason of the local service in distributing the same in Kansas. This contention cannot be sustained. Local incidental service at the initial point of the journey does not prevent the interstate character from attaching to the shipment; nor does a similar incidental local service at the end of the journey destroy that character. So. Pac. Term. Co. v. I. C. C., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310; United States v. Ill. Cent. (D. C.) 230 Fed. 940; Penn. R. Co. v. Clark Co., 238 U. S. 456, 465–468, 35 Sup. Ct. 896, 59 L. Ed. 1406; So. Ry. v. Prescott, 240 U. S. 632, 36 Sup. Ct. 469, 60 L. Ed. 836; Penn. Ry. Co. v. Sonman, 242 U. S. 120, 37 Sup. Ct. 46, 61 L. Ed. 188; Grand Union Tea Co. v. Evans (D. C.) 216 Fed. 791; City Lee Summit v. Jewel Co., 217 Fed. 965, 133 C. C. A. 637. Nor is the business carried on by the receiver, though interstate commerce in character, of such inherent local nature that it is subject to the regulation and control that is sought to be imposed by the state in the instant case. It is not always easy to determine where the line must be drawn between that exertion of state power in reference to interstate commerce, which is allowable on the one hand, and that which is forbidden on the other.

In Leisy v. Hardin, 135 U. S. 100, on page 119, 10 Sup. Ct. 681, on page 687 (34 L. Ed. 128), the court said in its opinion:

"Where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all the states, such as transportation between the states, including the importation of goods from one state into another. Congress can alone act upon it and provide the needed regulations. The absence of any law of Congress on the subject is equivalent to its declaration that commerce in that matter shall be free. Thus the absence of regulations as to interstate commerce with reference to any particular subject is taken as a declaration that the importation of that article into the states shall be unrestricted. It is only after the importation is completed, and the property imported has mingled with and become a part of the general property of the state, that its regulations can act upon it, except so far as may be necessary to insure safety in the disposition of the import until thus mingled."

It is true that property, though started as an interstate shipment, may, between the point of shipment and the point of ultimate destination, cease to be the subject of interstate commerce, and become subject to state action. The length and the purpose of the interruption of the transit are to be considered in determining the question. Diamond Match Co. v. Ontonagon, 188 U. S. 82, 23 Sup. Ct. 266, 47 L. Ed. 349; Gen. Oil Co. v. Crain, 209 U. S. 211, 229, 28 Sup. Ct. 475, 52 L. Ed. 754. Incidental stoppage is immaterial. Kelley v. Rhoads, 188 U. S. 1, 23 Sup. Ct. 259, 47 L. Ed. 359; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. It is also true that, though the shipment at its destination be unsold and still retain its character of interstate shipment, it may nevertheless be subject to certain state action; for example, taxation in connection with taxation of general

property throughout the state. Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382; Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091, 29 L. Ed. 257. Also to inspection. But this must not be of such a character as to unduly burden interstate commerce. Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455; Patapsco Co. v. Brd. of Agric., 171 U. S. 345, 356, 18 Sup. Ct. 862, 43 L. Ed. 191.

But state action is not permissible in certain other directions; for example, prohibition of the sale of the goods, except by express authority through congressional enactment. Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; Bowman v. Railway, 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; Lyng v. Michigan, 135 U. S. 161, 10 Sup. Ct. 725, 34 L. Ed. 150. Even in the matter of taxation, state action is not allowable which places taxation upon "the occupation of doing a business" interstate in character. Leloup v. Port of Mobile, 127 U. S. 640, 648, 8 Sup. Ct. 1383, 32 L. Ed. 311; Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1, 32 L. Ed. 368. The distinction between permissible and nonpermissible state action lies in "the nature and operation of the particular exertion of state authority." Am. Steel & Wire Co. v. Speed, 192 U. S. 500, 24 Sup. Ct. 365, 48 L. Ed. 538. In the case of the State Freight Tax, 15 Wall. 232, 21 L. Ed. 146, the rule was announced in the following language:

"Whenever the subjects over which a power to regulate commerce is asserted are in their nature national, or admit of one uniform system or plan of regulation, they may justly be said to be of such a nature as to require exclusive legislation by Congress. Surely transportation of passengers or merchandise through a state, or from one state to another, is of this nature."

In the case of South Covington Ry. Co. v. Covington, 235 U. S. 537, 35 Sup. Ct. 158, 59 L. Ed. 350, L. R. A. 1915F, 792, the court, in passing upon a municipal ordinance governing and regulating street cars running between that city and Cincinnati, Ohio, and with reference to one of the sections making it unlawful for the company to permit to ride in its cars more than one-third of the number of passengers over and above the number for which seats were provided therein, stated as follows:

"If Covington can regulate these matters, certainly Cincinnati can, and interstate business might be impeded by conflicting and varying regulations in this respect, with which it might be impossible to comply. On one side of the river one set of regulations might be enforced, and on the other side quite a different set, and both seeking to control a practically continuous movement of cars. As was said in Hall v. De Cuir, 95 U. S. 485, 489 [24 L. Ed. 597], 'commerce cannot flourish in the midst of such embarrassments.' We need not stop to consider whether Congress has undertaken to regulate such interstate transportation as this, for it is clearly within its power to do so, and absence of federal regulation does not give the power to the state to make rules which so necessarily control the conduct of interstate commerce as do those just considered."

As to the character of the business of transportation of natural gas, the Circuit Court of Appeals of this circuit has spoken as follows in the case of Haskell v. Cowham, 187 Fed. 403, 408, 109 C. C. A. 235, 240:

"Interstate commerce in natural gas, including therein its transportation among the states by pipe line, is a subject national in its character and susceptible of regulation by uniform rules. The silence or inaction of Congress

relative to such a subject is a conclusive indication that it intends that inter-state commerce therein shall be free, and any law or act of a state or its officers which prohibits it, or substantially restrains its freedom, is violative of the Constitution and void. Welton v. State of Missouri, 91 U. S. 275, 282, 23 L. Ed. 347; Brown v. Houston, 114 U. S. 622, 631, 5 Sup. Ct. 1091, 29 L. Ed. 257; Walling v. Michigan, 116 U. S. 446, 455, 456, 6 Sup. Ct. 454, 29 L. Ed. 691; Case of the State Freight Tax, 15 Wall. 232, 21 L. Ed. 146."

This case was cited with approval in West v. Kansas Natural Gas Company, 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193.

If anything further than the foregoing statement as to the character of the business actually carried on, and the application thereto of above cited authorities, were necessary, in order to establish that the business carried on by the receiver is interstate in its character, and of such a nature as not to be properly susceptible of or subject to local state regulations such as the 28-cent rate order, we have the statement of the Public Utilities Commission itself in its opinion of July, 1915, which opinion concluded with the following language:

"It developed upon the hearing that more than half the natural gas supplied and marketed by complainants is sold in the state of Missouri. It is conveyed by means of pipe lines passing through Kansas City, St. Joseph, and other cities in our sister state. It would be manifestly unfair to permit complainants to advance the price of gas to their Kansas patrons, unless a corresponding increase were made to consumers in Missouri. It is conceded that an advance in Kansas, without a similar one in Missouri, would be unavailing for the purposes contemplated by complainants, and they do not desire any advance in Kansas, except as it may be simultaneous with a corresponding one in Missouri. This Commission, therefore, awaits the pleasure and action of the rate-regulating body or bodies of Missouri having jurisdiction of the subject-matter; and if in that state proper and necessary orders be issued establishing a schedule of rates as herein outlined, an order, effective, if possible, simultaneously, will be issued by this Commission, in accordance with the views herein expressed."

The same conclusion was apparently reached by the Supreme Court of the state of Kansas, in State ex rel. v. Flannelly, 96 Kan. 372, 152 Pac. 22, when in its opinion the court said:

"The last question for our consideration concerns the legality of the rates, both those that are in existence at the present time and those named in the opinion of the Commission. The Commission finds that, where the net price of gas to consumers is now 25 cents per thousand cubic feet, the rate should be increased to 28 cents. This, in effect, is a finding that the rates now in existence are not compensatory. It then became the duty of the Commission to fix compensatory rates, taking into consideration the gas sold in Missouri, assuming that compensatory rates will be fixed in Missouri. However, we may say that obedience to law in making rates in Kansas cannot legally be made dependent on obedience to the same law in Missouri."

The state of Kansas itself has thus realized that the business carried on by the receiver is of such character that the fixing of rates thereon is not a merely local matter. Furthermore, control over the supply of gas is not within the power of the Commission. The supply is an important element, however, in the fixing of rates. This state of affairs militates strongly against a conclusion that the business is of such character as to be properly subject to state control in the matter of rates.

The case of Manufacturers' Heat & Light Company v. Ott (D. C.) 215 Fed. 940, relied upon by the defendant Commission, must be disregarded, if it conflicts with the decisions above cited, for these decisions are binding upon this court. It may, however, in my opinion, be distinguished by the fact that the great bulk of the business transactions considered in that case were concededly intrastate, and the portion claimed to be interstate of very minor importance; whereas, in the instant case exactly the reverse of those facts is true. It is true that about 6 per cent. of the gas delivered by the receiver in Kansas is produced in Kansas, but this cannot alter the general situation. Where a substantial part of a business is interstate commerce, the imposition of burdens and regulations thereon by state action cannot be justified by the fact that a portion of the business thus sought to be controlled and regulated is intrastate. See Leloup v. Port of Mobile, 127 U. S. 640, 647, 8 Sup. Ct. 1383, 32 L. Ed. 311; Norfolk Ry. v. Pennsylvania, 136 U. S. 114–119, 10 Sup. Ct. 958, 34 L. Ed. 394; Crutcher v. Kentucky, 141 U. S. 47, 59, 11 Sup. Ct. 851, 35 L. Ed. 649; Galveston Ry. v. Texas, 210 U. S. 217, 228, 28 Sup. Ct. 638, 52 L. Ed. 1031; W. U. Co. v. Kansas, 216 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355; Williams v. Talladega, 226 U. S. 404, 419, 33 Sup. Ct. 116, 57 L. Ed. 275.

It is claimed by the defendant Commission that the inaction of Congress, in view of the character of the business, is an indication that it was intended that state action, such as is involved in the instant case, might properly be exercised. Here again it is not always easy to draw a hard and fast line between cases in which, in the absence of congressional action, the state may properly act, and those in which it may not act. In the Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court in reference to this subject used the following language:

"The principle which determines this classification underlies the doctrine that the state cannot under any guise impose direct burdens upon interstate commerce. For this is but to hold that the states are not permitted directly to regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national Legislature constitutionally ordains."

Even in the absence of congressional action, the exercise of state authority over interstate commerce does not extend to the fixing of rates for the transportation of goods in such commerce. This doctrine was announced before the establishment of the Interstate Commerce Commission, and applies not merely to cases where that Commission has jurisdiction in reference to rates, but also in the absence of such jurisdiction. Wabash Ry. Co. v. Ill., 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244; L. N. R. v. Eubank, 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416; Ohio Ry. Com. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004. In the case of Railroad Commission of Ohio v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004, the following language is used:

"It is not necessary to review the cases in this court which have settled beyond peradventure that the national government has exclusive authority to regulate interstate commerce under the Constitution of the United States, nor

to do more than reaffirm the equally well-settled proposition that over interstate commerce transportation rates the state has no jurisdiction, and that an attempt to regulate such rates by the state or under its authority is void."

The conclusion reached, therefore is that the interstate commerce in which the receiver is engaged is not of a local nature, and is not, even in the absence of action by Congress, subject to burdens or regulations imposed by state action, which are substantial rather than incidental in their nature.

(C) Is the fixing of the 28-cent rate by the Public Utilities Commission in the present controversy a burden or a regulation upon interstate commerce such as the state is not authorized to impose? It is not necessary to review the many cases deciding what constitutes a burden upon or a regulation of interstate commerce. Reference may simply be made to the following amongst a great number: State Freight Tax Cases, 15 Wall. 232, 21 L. Ed. 146; Western U. Tel. Co. v. Kansas, 216 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355; International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103; Bucks Stove Co. v. Vickers, 226 U. S. 205, 33 Sup. Ct. 41, 57 L. Ed. 189; Minn. Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Sioux Remedy Co. v. Cope, 235 U. S. 197, 35 Sup. Ct. 57, 59 L. Ed. 193.

It appears from the evidence in the case that gas transported by the receiver from Oklahoma costs at the initial point 5 to 7 cents per 1,000 cubic feet. The difference between this cost price and the selling price to the consumer is largely, if not wholly, made up of the cost of transportation. It would seem to require no argument to establish that any statute or order fixing the price at which gas may be sold to the ultimate consumer is, under the circumstances disclosed by the present record, in fact a fixing of rates for the transportation of the gas. If this be the case, then, under the authorities heretofore cited, state action fixing such rates is not authorized; it being a direct burden upon and a direct attempt to regulate interstate commerce. It is true the cases cited, involved rates by common carriers; but, as already noted, interstate commerce is equally protected, whether engaged in by a common carrier or by individuals.

That the 28-cent rate is in reality a transportation rate, and so intended by the Commission, is also shown by the method adopted by the Commission in fixing the rate, viz.: First, dividing the property used by the receiver in his business into two parts, that used in production, and that used in transportation, and then using the valuation of the latter only as a basis for fixing the rate. In its opinion upon the preliminary injunction the enlarged court used the following language:

"That the enforcement by a state through its officers of any legislative act preventing interstate commerce in this article of interstate commerce, either by a direct prohibition of such commerce in this article by state law, or by an inhibition of a sale of the article in the state at any rate price whatever, or at any price above a price so low that the laws of trade make it impossible to purchase or procure it in another state and to sell and deliver it in the prohibiting state at that price with profit, substantially burdens and unduly inter-

feres with interstate commerce, in violation of the commerce clause of the Constitution of the United States."

To the foregoing statement may be added, perhaps as a corollary, that whenever a state, acting under the guise of fixing prices at which an article of interstate commerce brought into the state may be sold by the introducer upon its arrival at destination, in reality thereby necessarily fixes or regulates the rate of transportation of such article from its initial point to the point of destination, such action by the state in fixing the sale price is an attempt to directly burden and regulate interstate commerce, and is, therefore, unauthorized. When tested by either or both of the last-stated principles, the 28-cent rate order of the Public Utilities Commission of Kansas, dated December 10, 1915, made under an assumed authority from the state, is found to be an attempt to directly and unduly burden and regulate interstate commerce, and is therefore unauthorized. This does not necessarily mean that the receiver, or the company after the receivership, can fix rates at their discretion. There still remain remedies for unreasonable rates. See Covington Bridge Co. v. Kentucky, 154 U. S. 204, 222, 14 Sup. Ct. 1087, 38 L. Ed. 962.

To sum up the foregoing, it is held:

First, that the rates in force on January 1, 1911, under Laws Kan. 1911, c. 238, § 30, for the sale and delivery of natural gas by the receiver of the Kansas Natural Gas Company to consumers in Kansas, either directly or through intermediaries, were on December 10, 1915, and still are, noncompensatory, unreasonably low, confiscatory, and violative of the Constitution of the United States.

Second, that the new rates fixed by the Public Utilities Commission of Kansas by its order of December 10, 1915, known as the 28-cent rate order, for the sale and delivery of natural gas by the receiver of the Kansas Natural Gas Company, to consumers in Kansas, either directly or through intermediaries, were on said date, and still are, noncompensatory, unreasonably low, confiscatory, and violative of the Constitution of the United States.

Third, that section 30, c. 238, Laws Kan. 1911, in so far as it attempted to fix rates for the sale and delivery of natural gas by the receiver of the Kansas Natural Gas Company to consumers in Kansas, either directly or through intermediaries, was an attempt directly and unduly to burden and regulate interstate commerce, and therefore unauthorized and void.

Fourth, that the so-called 28-cent rate order by the Public Utilities Commission of Kansas, dated December 10, 1915, made under an assumed authority from the state, is an attempt to directly and unduly burden and regulate interstate commerce, and is therefore unauthorized and void.

Plaintiff is entitled to have the preliminary injunction heretofore granted made permanent. The court expressly reserves jurisdiction over the parties to the suit and over the other issues involved therein until further order is made in reference thereto.

A decree may be prepared in accordance with the foregoing decision.